**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UMB BANK, NATIONAL ASSOCIATION,

*Plaintiff*,

v.

REVLON, INC., REVLON CONSUMER PRODUCTS
CORPORATION, BEAUTYGE I, BEAUTYGE II, LLC,
BRANDCO ALMAY 2020 LLC, BRANDCO CHARLIE
2020 LLC, BRANDCO CND 2020 LLC, BRANDCO
CURVE 2020 LLC, BRANDCO ELIZABETH ARDEN
2020 LLC, BRANDCO GIORGIO BEVERLY HILLS
2020 LLC, BRANDCO HALSTON 2020 LLC,
BRANDCO JEAN NATE 2020 LLC, BRANDCO
MITCHUM 2020 LLC, BRANDCO MULTICULTURAL
GROUP 2020 LLC, BRANDCO PS 2020 LLC,
BRANDCO WHITE SHOULDERS 2020 LLC,
CITIBANK, N.A., JEFFERIES FINANCE LLC,
JEFFERIES LLC, ARES CORPORATE
OPPORTUNITIES FUND V, L.P., ASOF HOLDINGS II,
L.P., ASSF IV AIV B HOLDINGS III, L.P., and "JOHN
DOES," numbers 1 through 25, fictitiously named parties,
true names being unknown, the parties intended being
lenders to Revlon Consumer Products Corporation under
the 2020 BrandCo Credit Agreement,

*Defendants*.

No. 20 Civ. ____ (___)

**COMPLAINT**

---

Plaintiff UMB Bank, National Association ("Plaintiff" or "UMB Bank"), by its attorneys

Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint against Defendants Revlon, Inc.,

Revlon Consumer Products Corporation, Beautyge I, Beautyge II, LLC, BrandCo Almay 2020

LLC, BrandCo Charlie 2020 LLC, BrandCo CND 2020 LLC, BrandCo Curve 2020 LLC, BrandCo

Elizabeth Arden 2020 LLC, BrandCo Giorgio Beverly Hills 2020 LLC, BrandCo Halston 2020

LLC, BrandCo Jean Nate 2020 LLC, BrandCo Mitchum 2020 LLC, BrandCo Multicultural Group

2020 LLC, BrandCo PS 2020 LLC, BrandCo White Shoulders 2020 LLC, Citibank, N.A., Jefferies

Finance LLC, Jefferies LLC, Ares Corporate Opportunities Fund V, L.P., ASOF Holdings II, L.P., ASSF IV AIV B Holdings III, L.P., and John Does 1-25 (together, "Defendants"), alleges as follows:

## NATURE OF THE ACTION[1]

1.     In the fall of 2016, Revlon Consumer Products Corporation ("RCPC"), the principal operating subsidiary of Revlon, Inc., borrowed nearly $2 billion pursuant to a new Term Credit Agreement (the "2016 Credit Agreement").  RCPC entered into the 2016 Credit Agreement in connection with the acquisition of Elizabeth Arden, a leading global beauty company.  The 2016 Credit Agreement included both a $1.8 billion term loan facility (the "2016 Term Loan Facility") and provisions for the issuance of supplemental revolver loans to fund RCPC's business operations.

2.     The first-priority liens securing the loans made under the 2016 Credit Agreement were at the very heart of the loan transaction.  As explained in Revlon, Inc.'s 2016 Annual Report, "if the Company is unable to repay, refinance or restructure its indebtedness under the 2016 Senior Credit Facilities, the lenders could proceed against the collateral securing that indebtedness."  By far, the most important and most valuable property included in the basket of collateral securing the loans was RCPC's intellectual property, including its trademarks and other rights associated with many of the best known, well-established beauty brands in the world.  The value attributed to these household names—including Elizabeth Arden itself—was enormous relative to the value of the entire Revlon enterprise, and the lenders under the 2016 Term Loan Facility (the "2016 Term Lenders") premised their investments on the quality of, and their access to, this collateral.

---

[1]   Capitalized terms not defined in the Nature of the Action shall have the meanings attributed to them later in the Complaint.

3.     In the years following RCPC's acquisition of Elizabeth Arden, RCPC faced new challenges.  First, it was losing market share to e-commerce sellers and specialty beauty shops, and Revlon's traditional reliance on established fashion icons as ambassadors for its brands was failing to generate the same buzz as fashion upstarts and self-made experts who were savvy with social media platforms. At the same time, RCPC's debt burden, including most notably the 2016 Term Loan Facility undertaken to acquire Elizabeth Arden, was becoming difficult to service.  In January 2018, just 16 months after the Elizabeth Arden acquisition, Revlon Inc. CEO Fabian Garcia resigned to "pursue other opportunities."  RCPC was struggling.

4.     In August 2019, RCPC took its first known step in stealing away the 2016 Term Lenders' collateral.   Specifically, RCPC borrowed $200 million from Ares Corporate Opportunities Fund V, L.P., ASOF Holdings II, L.P., and ASSF IV AIV B Holdings III, L.P. (collectively, "Ares") pursuant to a new credit agreement (the "2019 Credit Agreement").  But, Ares did not lend, and would not have lent, $200 million to RCPC if its loans were to rank junior to, or ratably with, the existing 2016 Term Loan Facility.  Rather, Ares required its own, exclusive collateral—at least $200 million worth.

5.     RCPC was able to induce Ares to lend only by taking away some of the collateral securing the 2016 Credit Agreement and pledging it instead as collateral to Ares under the 2019 Credit Agreement.  RCPC achieved this prohibited result by transferring intellectual property associated with its valuable American Crew brand (the "American Crew IP")—the top men's grooming brand in the country—to a new subsidiary where that intellectual property purportedly was no longer collateral for the 2016 Credit Agreement.  Allegedly free from those restrictions, Ares was then provided with a first-priority lien on the American Crew IP.  The new subsidiary

then leased back to RCPC the right to use the American Crew IP, which continued its sale and marketing of American Crew products without any change.

6.    RCPC's transfer and leaseback of the American Crew IP was a direct breach of plain language found in Section 7.10 of the 2016 Credit Agreement, which bars such sale-leaseback transactions  and expressly refers to intangible property such as the transferred intellectual property rights.  The bottom line was simple:  In August 2019, in direct breach of the 2016 Credit Agreement, RCPC took some of the 2016 Term Lenders' collateral, moved it to a new entity, and gave its new lender, Ares, its own, exclusive security interest in the very same property.

7.    The theft of the American Crew IP in connection with the 2019 Credit Agreement was an event of default under the 2016 Credit Agreement.  More importantly, it reflected that Revlon was willing to breach clear and unambiguous contractual obligations for new money—in this instance, $200 million.  And, as it turned out, Revlon was just getting started.  When Revlon wanted to take on *more* debt, it simply took more Collateral from the 2016 Term Lenders.

8.    Barely six months later, in the spring of 2020, Revlon went back to the well, unveiling a much bigger, bolder transaction, in which RCPC—still struggling from its inability to compete with more modern brands and marketing techniques—siphoned off nearly all of the remaining intellectual property securing its payment on the 2016 Credit Agreement in order to obtain more cash though yet another series of even larger loans.  Starting in March 2020, and continuing through the end of April, RCPC—assisted by its advisor, Jefferies, a global leader in debt advisory and restructuring that was prepared to do "anything" to get the transaction done—engineered a new transaction, again in violation of the 2016 Credit Agreement, to siphon off a vast array of valuable intellectual property from the 2016 Term Lenders: Pursuant to the transaction, which was consummated on May 7, 2020 (the "2020 Transaction"), RCPC transferred intellectual

property rights for Elizabeth Arden, Almay, Mitchum, CND, Creme of Nature, Lottabody, Roux, Fancifull, Curve, Charlie, and several other brands (with the American Crew IP, the "BrandCo IP") to subsidiaries, and issued new loans that had priority liens—displacing the 2016 Term Lenders—on the BrandCo IP.  Once again, the transferred intellectual property was immediately leased back to RCPC so that RCPC could continue using the BrandCo IP as if the financial machinations had never taken place.

9.    Through the 2020 Transaction, RCPC issued $880 million in a new loan with a first-priority lien on the BrandCo IP ("2020 New Money Facility"), a portion of which RCPC used at closing to retire the $200 million term loan issued to Ares under the 2019 Credit Agreement.  In addition, as an inducement to cause Ares and certain existing 2016 Term Lenders to participate in the unlawful 2020 New Money Facility, RCPC purported to "roll-up" approximately $953 million of 2016 Term Loan Facility into "new" loan facilities with second and third liens in the BrandCo IP (the "2020 Roll-Up Facility" and "2020 Junior Roll-Up Facility," respectively, and, with the 2020 New Money Facility, the "2020 Facilities"), leaving the remaining 2016 Term Lenders with no security interest in the BrandCo IP.  At the same time, the 2016 Term Lenders' security interest in the remaining assets of RCPC and its subsidiaries was diluted by a massive "pari passu" lien securing the 2020 Facilities (the "Pari Passu Lien").

10.    To complete the 2020 Transaction, Revlon acknowledged that it needed lender consent under the 2016 Credit Agreement.  And this time, the 2016 Term Lenders—now familiar with RCPC's pillaging techniques having been burnt once with respect to the American Crew IP— assembled in an effort to protect themselves against further theft of their collateral.  A group of more than 50% of the 2016 Term Lenders (the "Co-Op Lenders") entered into a joint cooperation agreement and made it clear that they would not consent to the threatened 2020 Transaction.  And,

as the Co-Op Lenders knew, without the consent of the majority of lenders under the 2016 Credit Agreement, RCPC could not transfer BrandCo IP, release the 2016 Term Lenders' liens thereon, or grant the dilutive Pari Passu Lien.

11.     Having effectuated its 2019 transfer of American Crew IP, RCPC was caught off guard by the united and organized opposition to the 2020 replay.   At the last minute, however, RCPC devised what it thought to be an end-run around the consent requirement:   It would issue new, unfunded revolver commitments (not real loans, just empty promises to loan) under the 2016 Credit Agreement to the lenders that would be participating in the soon-to-be-created new credit facility and who knew their new revolver commitments would never be drawn.   RCPC took the position that these new "lenders" would then be afforded the right to vote (even though they had no economic stake or standing to do so), thereby conjuring up a false majority consent for the 2020 Transaction.   These fake commitments rigged the math:   RCPC would issue the exact amount of commitments necessary to inch over the 50.0% consent threshold.   The new revolver commitments served no legitimate business purpose; rather, they were created solely to manipulate and gerrymander voting on the Proposed Amendment so that RCPC could consummate its scheme to siphon away substantially all of the collateral from the 2016 Term Lenders.

12.     The 2016 Term Lenders immediately challenged RCPC's issuance of the new revolver commitments, identifying the commitments as a sham mechanism designed to rig the vote.   RCPC responded by tweaking its plan (in form, but not in substance): RCPC announced that *actual* loans under the new revolver commitments would now be drawn down, in an effort to suggest that the revolvers served some valid business purpose.   But the sham remained.   No rational lender would lend new money to RCPC under the 2016 Credit Agreement—the 2016 Term Loans were trading at around 43 cents on the dollar, and were certain to move much lower if the

transaction went through.  And, in fact, no lender did.  Rather, Revlon had arranged for these fake revolver "loans" to be replaced by the soon-to-be-issued loans under the 2020 Facilities, and secured by the BrandCo IP, only days after the 2020 term loan was issued.  Once again, RCPC's plan revealed the new revolvers to be nothing more than a sham.  The revolving loans were *designed to vote against their own fake interest and to vanish only days after being issued*. Consistent with this blueprint, the revolving loans disappeared exactly 15 business days after they were issued.  In substance, RCPC arranged for the would-be lenders under the 2020 BrandCo Credit Agreement to vote under the 2016 Credit Agreement so that those very same lenders could convert their underwater 2016 loans to fully secured loans under the new 2020 BrandCo Credit Agreement.  Upon information and belief, the inclusion of the Sham Revolver allowed the amendment to pass by *less than half a percent*.  The capital markets have not seen a borrower like Revlon for some time, and have never seen a scheme as brazen as the 2020 Transaction.

13.    RCPC's issuance of the vote-manipulating sham revolver loans were not only plainly made in bad faith, they were also an express and independent violation of the 2016 Credit Agreement's prohibition on issuing new revolver loans when there was a pre-existing, continuing event of default.  Days before the issuance of the revolver loans, certain of the Co-Op Lenders delivered to Citibank, their agent on the 2016 Credit Agreement, a Notice of Event of Default, setting forth RCPC's breach of the sale-leaseback prohibition when it completed the transfer of the American Crew IP under the 2019 financing transaction with Ares.  The Notice of Event of Default should have stopped RCPC and Citibank in their tracks.  Instead, RCPC simply brushed the notice aside, brazenly asserting that there was nothing wrong with the 2019 transaction or its transfer of the American Crew IP.  And Citibank, in utter disregard for its duties as the lenders' agent, willfully ignored the default notice and acceded to RCPC's request to issue the sham

revolver loans. Citibank did not even put the other 2016 Term Lenders on notice of the Event of Default—as it was required to do under the 2016 Credit Agreement. Citibank's behavior was stunning, and yet consistent. Days earlier, the Co-Op Lenders directed Citibank to resign (as Citibank's Head of Global Debt Capital Markets, backed up by Citibank's CEO, had earlier promised to a large 2016 Term Lender that it would do). Citibank refused to resign, instead electing to breach its duties and facilitate the sham transaction.

14.     In the days after its unprecedented vote rigging, RCPC—again with the assistance of its accomplice, Citibank—finalized the transaction that robbed the 2016 Term Lenders of their collateral. In early May 2020, Revlon purported to complete the 2020 Transaction, to release the 2016 Term Lenders' first-priority lien on substantially all of their collateral, to siphon collateral away from the 2016 Term Lenders and their borrower (RCPC), and to repledge the collateral to secure $2 billion in loans held by other lenders. On top of that, and rubbing salt in the wound, the 2020 Transaction purported to grant the Pari Passu Lien and take control over enforcement rights with respect to the limited collateral *remaining* at RCPC away from the 2016 Term Lenders, and to give it to the new agent under the 2020 Facilities. RCPC, assisted by Citibank, completed the transaction even though, *among other things*:

- The Co-Op Lenders put RCPC on notice that they would not consent to the 2020 Transaction;

- The 2020 Amendment was invalidly approved by a "majority" of lenders only by including the votes of the Sham Revolver lenders, who were not entitled to vote and who had no actual economic interest under the 2016 Credit Agreement that they were voting to amend;

- The transfer of the American Crew IP in 2019, for the benefit of Ares, was an Event of Default under the 2016 Credit Agreement;

- The 2016 Lenders properly noticed RCPC of the existing Event of Default, which precluded the issuance of the Sham Revolver under an express term of the 2016 Credit Agreement;

- RCPC, with the assistance of Citibank and a group of preexisting lenders (the "AHG Lenders," defined below), created the Sham Revolver solely to manipulate voting and deprive the majority of lenders of their contractual right under the 2016 Credit Agreement to reject the amendment that would take away the security on their loans;

- Several aspects of the 2020 Amendment, in all events, required consent from *the majority of 2016 Term Lenders* (not including the lenders under the Revolver), and thus were invalidly adopted notwithstanding the vote of the Sham Revolver lenders;

- The release of liens on all or substantially all of the collateral securing the loans under the 2016 Credit Agreement was not permitted without the consent of *all lenders* under that agreement;

- The 2020 Transaction, like the completion of the 2019 Credit Agreement, incorporated a sale-leaseback that plainly violated the 2016 Credit Agreement's prohibition of such transactions;

- RCPC was deeply insolvent; and

- Citibank's Global Head of Debt Capital Markets promised Citibank would resign if directed to do so by the Co-Op Lenders, and was so directed.

Only after performing its role in the sham transaction did Citibank finally agree to resign.

15.    The 2020 Transaction was devastating for 2016 Term Lenders—substantially all of the collateral that they had relied upon in extending the 2016 Loans, and to ensure repayment of those loans, has now been ripped away and pledged to other lenders.  The impact on the 2016 Term Lenders is reflected in the trading price for the 2016 Loans, which has plummeted.  As the market correctly understands, the 2016 Term Loan Facility is no longer a fully secured, first-priority obligation of the company.  Under the terms of the 2020 Transaction, the 2016 Term Loans are now subordinate to $2 billion in "loan" obligations (approximately 50% of which simply rolled up existing Term Loans and provided no new money) as to the BrandCo IP, loans that never would have been issued had the company and Citibank heeded their lawful obligations.

16.    The 2016 Term Lenders must be placed back into the position they would occupy had RCPC not repeatedly breached its obligations under the 2016 Credit Agreement.  Among other

things, the 2016 Term Lenders' exclusive first-priority liens on all of the transferred collateral must be reinstated, giving them the benefit of their bargain when they agreed to loan money to RCPC under the 2016 Credit Agreement. Similarly, having fundamentally failed in its duties as the lenders' agent (under any conceivable standard), Citibank is liable to the 2016 Term Lenders for the damages resulting from its gross negligence and willful misconduct.

17. Moreover, because RCPC transferred the intellectual property collateral and new liens with the actual intent to hinder or delay the 2016 Term Lenders, and RCPC was insolvent at the time of the 2020 Transaction and did not receive reasonably equivalent value in exchange for the series of transfers and obligations it effected, the transfer of the BrandCo IP constitutes a fraudulent conveyance under Article 10 of N.Y. Debtor & Creditor Law §§ 270-281 (*i.e.*, the Uniform Voidable Transfers Act). Accordingly: (i) the BrandCo IP must be returned to RCPC and held for the benefit of the 2016 Term Lenders; (ii) the new liens securing the 2020 Term Loans must be avoided in full; and (iii) the obligations underlying the 2020 Term Loans must be avoided in full. Disbursements made by Revlon on account of obligations incurred pursuant to the 2020 Transaction must also be similarly avoided.

18. This case is a stark example of a borrower that has ignored repeatedly its legal obligations to its lenders. COVID-19 is no license to breach contractual commitments to lenders, to engage in transparent vote rigging, and to steal and reuse collateral for alternative purposes. Moreover, Revlon's weak financial position called for greater scrutiny and respect for creditors' rights even before the pandemic. RCPC and the parties that assisted RCPC in carrying out these acts should be held accountable for their conduct, and the stolen collateral should be returned so that it can continue to provide the contractually mandated protection for the 2016 Term Lenders.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to the Edge Act, 12 U.S.C. § 632, because Defendant Citibank is a national banking association and this action arises out of transactions involving Citibank's international banking and/or financial operations. Dozens of the 2016 Term Lenders, holding hundreds of millions of dollars in 2016 Term Loans, are entities organized under foreign laws.  Citibank served as their Administrative Agent and Collateral Agent, which, among other things, entailed Citibank's holding of collateral for, collection of debt payments for and distribution of such payments to, and maintaining liens for the benefit of these foreign entities.  Similarly, UMB Bank, which is now agent for the 2016 Term Lenders, is a national banking association.

20.     Separately and additionally, this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (i) citizens of different States or (ii) citizens of different States and in which citizens or subjects of a foreign state are additional parties. As stated *infra*, Plaintiff UMB Bank, National Association is a national association organized under the National Bank Act with its main office located in the State of Missouri.  Having conducted a good faith inquiry regarding the citizenship of the Defendants, Plaintiff alleges, on information and belief, that none of the Defendants is a citizen of Missouri for purposes of determining diversity jurisdiction.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.  Among other things, Revlon, Citibank, and Jefferies all have principal operations in this District and accordingly, on information and belief, that the transactions at issue in this action were

designed and completed in the District.   Venue is further proper pursuant to Section 10.12

("Submission to Jurisdiction; Waivers") of the 2016 Credit Agreement.

22.     This Court has personal jurisdiction over Revlon, Inc., Revlon Consumer Products

Corporation, and Citibank, N.A. pursuant to Section 10.12 ("Submission to Jurisdiction") of the

2016 Credit Agreement.

23.     This Court has personal jurisdiction over the BrandCo Entities as each are wholly

owned subsidiaries and mere instrumentalities of Revlon Consumer Products Corporation.

24.     This Court has personal jurisdiction over Jefferies Finance LLC and Jefferies LLC,

whose principal place of business is in the State of New York.

25.     This Court has personal jurisdiction over Ares Corporate Opportunities Fund V,

L.P., ASOF Holdings II, L.P., ASSF IV AIV B Holdings III, L.P. pursuant to Section 10.12

("Submission to Jurisdiction") of the 2019 Credit Agreement.

## THE PARTIES

26.     Plaintiff UMB Bank, National Association is a national association organized under

the National Bank Act with its main office located in the State of Missouri.  In addition to asserting

claims for the benefit of the 2016 Term Lenders in its capacity as Administrative Agent under the

2016 Credit Agreement, as amended, Plaintiff asserts certain of the claims as assignee of certain

lenders, all of whom were 2016 Term Lenders that opposed the 2020 Amendment to the 2016

Credit Agreement and who have assigned all of their personal claims and causes of action asserted

herein to Plaintiff for prosecution and collection.

27.     Defendant Revlon, Inc. is a corporation organized under the laws of the State of

Delaware with its principal place of business in New York, New York.

28.     Defendant Revlon Consumer Products Corporation ("RCPC" or "Borrower" and

along with Revlon, Inc., "Revlon") is a corporation organized under the laws of the State of

Delaware with its principal place of business in New York, New York.  RCPC is a wholly owned subsidiary of Revlon, Inc.

29.    Defendant Beautyge I ("BrandCo Holdings") is an exempted company incorporated in the Cayman Islands that acts as a holding company.  Upon information and belief, BrandCo Holdings' principal place of business is in New York, New York.

30.    Defendant Beautyge II, LLC ("BrandCo") is a limited liability company organized under laws of the State of Delaware.

31.    Defendant BrandCo Almay 2020 LLC ("Almay BrandCo") is a limited liability company organized under laws of the State of Delaware.

32.    Defendant BrandCo Charlie 2020 LLC ("Charlie BrandCo") is a limited liability company organized under laws of the State of Delaware.

33.    Defendant BrandCo CND 2020 LLC ("CND BrandCo") is a limited liability company organized under laws of the State of Delaware.

34.    Defendant BrandCo Curve 2020 LLC ("Curve BrandCo") is a limited liability company organized under laws of the State of Delaware.

35.    Defendant BrandCo Elizabeth Arden 2020 LLC ("Elizabeth Arden BrandCo") is a limited liability company organized under laws of the State of Delaware.

36.    Defendant BrandCo Giorgio Beverly Hills 2020 LLC ("Giorgio Beverly Hills BrandCo") is a limited liability company organized under laws of the State of Delaware.

37.    Defendant BrandCo Halston 2020 LLC ("Halston BrandCo") is a limited liability company organized under laws of the State of Delaware.

38.    Defendant BrandCo Jean Nate 2020 LLC ("Jean Nate BrandCo") is a limited liability company organized under laws of the State of Delaware.

39.     Defendant BrandCo Mitchum 2020 LLC ("Mitchum BrandCo") is a limited liability company organized under laws of the State of Delaware.

40.     Defendant BrandCo Multicultural Group 2020 LLC ("Multicultural Group BrandCo") is a limited liability company organized under laws of the State of Delaware.

41.     Defendant BrandCo PS 2020 LLC ("PS BrandCo") is a limited liability company organized under laws of the State of Delaware.

42.      Defendant BrandCo White Shoulders 2020 LLC ("White Shoulders BrandCo") is a limited liability company organized under laws of the State of Delaware.

43.     Defendants Almay BrandCo, Charlie BrandCo, CND BrandCo, Curve BrandCo, Elizabeth Arden BrandCo, Giorgio Beverly Hills BrandCo, Halston BrandCo, Jean Nate BrandCo, Mitchum BrandCo, Multicultural Group BrandCo, and PS BrandCo (the "BrandCo Subsidiaries") and BrandCo are all sister companies, each of which is a wholly owned subsidiary of BrandCo Holdings (together with BrandCo and the BrandCo Subsidiaries, the "BrandCo Entities").  The BrandCo Entities are wholly owned, indirectly, by RCPC.[2]

44.     Defendant Citibank, N.A. ("Citibank," "Agent," "Administrative Agent," or "Collateral Agent") is a national association organized under the National Bank Act with its main office located in the State of South Dakota.

---

[2]  BrandCo and the BrandCo Subsidiaries are wholly owned subsidiaries of BrandCo Holdings. BrandCo Holdings is a wholly owned subsidiary of Beautyge Brands USA, Inc., a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.  Beautyge Brands USA, Inc. is a wholly owned subsidiary of Roux Laboratories, Inc., a corporation organized under the laws of the State of New York with its principal place of business in New York.  Roux Laboratories, Inc. is a wholly owned subsidiary of Beautyge U.S.A., Inc. (f/k/a Colomer U.S.A.), a corporation organized under the laws of the State of Delaware with its principal place of business in New York.  Beautyge U.S.A., Inc. is a wholly owned subsidiary of RCPC.

45.     Defendant Jefferies Finance, LLC is a limited liability company organized under the laws of the State of Delaware.  Jefferies Finance LLC is 50% owned by Jefferies Group LLC and 50% by Massachusetts Mutual Life Insurance Co.  Jefferies Group LLC is a wholly owned subsidiary of Jefferies Financial Group Inc., which is incorporated in the State of New York and has its principal place of business in New York, New York.  Massachusetts Mutual Life Insurance Co. is a Massachusetts mutual company with its principal place of business in Springfield, Massachusetts.

46.     Defendant Jefferies LLC (together with Jefferies Finance, LLC, "Jefferies") is a limited liability company organized under the laws of the State of Delaware.  Jefferies LLC is a wholly owned subsidiary of the Jefferies Group LLC, which in turn is a wholly owned subsidiary of Jefferies Financial Group Inc., which is incorporated in the State of New York and has its principal place of business in New York, New York

47.     Defendant Ares Corporate Opportunities Fund V, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in Los Angeles, California.  Having conducted a good faith inquiry, Plaintiff is not aware of any partners of Ares Corporate Opportunities Fund V, L.P. that are citizens of Missouri.

48.     Defendant ASOF Holdings II, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in Los Angeles, California.  Having conducted a good faith inquiry, Plaintiff is not aware of any partners of ASOF Holdings II, L.P. that are citizens of Missouri.

49.     Defendant ASSF IV AIV B Holdings III, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in Los Angeles, California.

Having conducted a good faith inquiry, Plaintiff is not aware of any partners of ASSF IV AIV B Holdings III, L.P. that are citizens of Missouri.

50.     "John Does," numbers 1 through 25, fictitiously named parties, their true names being unknown, are lenders to RCPC under the 2020 BrandCo Credit Agreement.  ("John Doe Lenders" and along with Revlon, Citibank, Jefferies, and the BrandCo Entities, "Defendants").  If the names become known, all subsequent proceedings shall be taken under the true names and all prior proceedings shall be deemed amended accordingly.  The "Ad Hoc Lenders" constitute a subset of the John Doe Lenders who worked with Revlon to structure the 2020 Transaction, including the transfer of collateral and stripping of liens that injured the 2016 Term Lenders.

## STATEMENT OF FACTS

### I.     The 2016 Credit Agreement

51.     On June 16, 2016, Revlon agreed to a cash acquisition of all of the outstanding shares of Elizabeth Arden, Inc. ("Elizabeth Arden").  Nearly three months later, on September 7, 2016, Revlon, Inc. and its direct, wholly owned operating subsidiary RCPC acquired Elizabeth Arden for $1.03 billion.  The acquisition was structured as a merger, resulting in Elizabeth Arden becoming a wholly owned subsidiary of RCPC.

52.     Lacking the cash on hand to acquire Elizabeth Arden, Revlon entered into two credit facilities to finance the merger and to help service the existing debt of the merged entity.  In connection with and substantially concurrently with the closing of the merger, RCPC and Revlon, Inc. entered into a credit agreement (the "2016 Credit Agreement"), which established a seven-year, $1.8 billion senior secured term loan facility (the "2016 Term Loan Facility").  RCPC and Revlon, Inc. also entered into another credit agreement (the "2016 ABL Agreement"), which established a five-year $400 million senior secured asset-based revolving credit facility (the "2016 ABL Facility").  The 2016 Credit Agreement also allowed for the establishment of its own

revolving credit facility (the "2016 Revolving Facility"), but it was not established at closing nor in the nearly four years preceding the transaction at issue here.

53.    The 2016 Term Loan Facility provided the vast majority of funding for the $1.03 billion acquisition of Elizabeth Arden.  The remaining proceeds of the 2016 Term Loan Facility were used to refinance or retire indebtedness of RCPC and Elizabeth Arden, including debt that financed RCPC's $665 million 2015 acquisition of The Colomer Group, a beauty care company that owned brands including American Crew, Inc.  ("American Crew").

54.    Citibank was appointed Administrative Agent and Collateral Agent for the lenders under the 2016 Credit Agreement.

55.    The 2016 Term Loan Facility was guaranteed by each of RCPC's existing and future direct or indirect wholly owned domestic restricted subsidiaries, including Elizabeth Arden, Beautyge Brands USA, Inc. (f/k/a Colomer Beauty Brands USA, Inc.), and Beautyge U.S.A., Inc. (f/k/a Colomer U.S.A., Inc.).[3]  Revlon, Inc. also guaranteed the 2016 Term Loan Facility on a limited recourse basis.  The obligations of Revlon, Inc., RCPC, and certain subsidiary guarantors under the 2016 Term Loan Facility and 2016 ABL Facility were secured by pledges of the equity of RCPC held by Revlon, Inc. and the equity in Elizabeth Arden and its domestic subsidiaries held by RCPC, as well as by substantially all personal and real property, whether tangible or intangible, of RCPC, Elizabeth Arden, and subsidiary guarantors defined under both agreements.  Revlon, Inc., RCPC and certain restricted subsidiaries granted liens to the lenders under both the 2016 Term Loan Facility and the 2016 ABL Facility.  The guarantees and underlying collateral were set forth in a Guarantee and Collateral Agreement.

---

[3]    Beautyge Brands USA, Inc. and Beautyge U.S.A., Inc. owned American Crew and its intangible property.

56.     In connection with the above pledges, the 2016 Term Loan Facility was secured by liens on the accounts, inventory, equipment, chattel paper, documents, instruments, deposit accounts, real estate and certain investment property, and general intangibles (other than intellectual property), second in priority only to the liens thereon securing the 2016 ABL Facility.

57.     By contrast, the liens securing the 2016 Term Loan Facility on all other property, including intellectual property and the capital stock of its subsidiaries ranked *first* in priority, and therefore were senior to the liens thereon securing the 2016 ABL Facility.[4]

58.     The first-priority liens on the intellectual property of RCPC, Elizabeth Arden, and subsidiary guarantors constituted crucial security for the lenders under the 2016 Term Loan Facility (the "2016 Term Lenders").  The 2016 Term Lenders specifically bargained with Revlon, Inc. and RCPC to acquire first-priority liens on the intellectual property of RCPC and its domestic subsidiaries, especially Elizabeth Arden and its domestic subsidiaries whose acquisition the 2016 Term Loan Facility was financing.

59.     As Revlon's SEC filings acknowledge, "[Revlon's] trademarks, patents and other intellectual property rights are extremely important to [Revlon's] success and its competitive position."  The intellectual property of cosmetics, skin care, fragrance, and personal care companies like Revlon are their most valuable assets.  Under other names, the products of Revlon and its trademarked brands would sell at a fraction of the price and volume they currently do.

---

[4]     Revlon 2016 Annual Report at 53 ("The liens securing the 2016 Term Loan Facility on all other property, including capital stock, intellectual property and certain other intangible property (the 'Term Loan Collateral'), rank first in priority to the liens thereon securing the 2016 [ABL] Facility, while the liens thereon securing the 2016 [ABL] Facility rank second in priority to the liens thereon securing the 2016 Term Loan Facility."), *available at* https://investors.revlon.com/static-files/3fa032da-21e1-4d4a-97d6-39764b2929cb.

Elizabeth Arden's intangible property, alone, is worth *hundreds of millions* of dollars and constitutes more than half of Elizabeth Arden's total value.[5]

## II.    The 2019 Term Loan Agreement and the Resulting Event of Default

60.    On August 6, 2019, RCPC entered into a new senior secured term loan facility (the "2019 Term Loan Facility") governed by a term loan agreement (the "2019 Term Loan Agreement") with Ares Management LLC and/or certain of its affiliated funds, investment vehicles, or managed or advised accounts ("Ares"), in an initial aggregate principal amount of $200 million.  Wilmington Trust, National Association, acted as administrative agent and collateral agent.  The maturity date of the 2019 Term Loan Facility was set so that it could be earlier, but in no event later, than the maturity date of the 2016 Term Loan Facility.

61.    The 2019 Term Loan Facility shared the same guarantors and collateral as the 2016 Term Loan Facility, but was also secured by a first-priority lien on certain intellectual property used in the American Crew business (the "American Crew IP").  The first-priority lien on the American Crew IP that had secured the 2016 Term Loan Facility was released, the American Crew IP was transferred away from RCPC to a new subsidiary that did not guarantee the 2016 Term Loans, and a new lien on the American Crew IP was granted to Ares.

62.    The stripping of the 2016 Term Lenders' lien on the American Crew IP was effectuated as part of a sale-leaseback transaction.  This transaction (the "American Crew IP Sale-Leaseback Transaction") breached the 2016 Credit Agreement.

---

[5]   In the Consolidated Financial Statements appended to Revlon's 2016 Annual Report, the company conducted a Purchase Price Allocation to record the estimated fair values of the net assets acquired in the Elizabeth Arden transaction. Intangible assets and goodwill comprised $332.8 million and $202.0 million, respectively, or more than half of the $1.03 billion acquisition consideration. *Id.* at F-18.

63.     Pursuant to Section 7.10 of the 2016 Credit Agreement, RCPC and its Restricted Subsidiaries may not enter into any "Sale[] and Leaseback[]" transaction, wherein they transfer property, whether real, personal, mixed, tangible, or intangible and then lease such property. Specifically, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or any of its Restricted Subsidiaries . . . ." 2016 Credit Agreement § 7.10.

64.     An exception to the sale-leaseback prohibition exists for Property whose "Fair Market Value . . . does not exceed the greater of (i) $100,000,000 and (ii) 3.0% of Consolidated Total Assets at the time of such event in the aggregate for all such arrangements." 2016 Credit Agreement § 7.10. This exception did not apply to the American Crew IP Sale-Leaseback Transaction. The Fair Market Value of the American Crew IP exceeded $100,000,000, which was greater than 3.0% of Consolidated Total Assets.

65.     The American Crew brand, which is part of the American Crew IP, is perhaps the most popular and recognizable men's personal care brand in the entire world. According to Revlon's April 2020 lender presentation, American Crew is the "#1 Men's Grooming Brand," "#1 Men's Professional Brand Worldwide," and "#1 in Men's Styling & Hair Care in the US." In the presentation, Revlon reported that, in 2019 alone, American Crew generated $79 million in net sales and $35 million in direct contribution margin, and is worth $300 million.

66.     Notwithstanding her familiarity with American Crew's brand value, and the fact that Ares was advancing $200 million of new money loans secured by the American Crew IP (which fact itself was powerful evidence of contemporaneous market value), Revlon's CFO certified that the American Crew IP was worth no more than $100 million, a certification made without the benefit or support of a formal valuation of the assets, whether by Revlon or an independent third-party charged to do so.

67.     Moreover, on April 29, 2020, RCPC's General Counsel issued a new certificate making no mention whatsoever of the purported valuation of the American Crew IP and arguing instead that the 2019 transaction did not involve a prohibited sale-leaseback, effectively abandoning the CFO's position advanced less than a year ago.  The General Counsel's apparent refusal to embrace the August 2019 "fair market value" was an implicit rejection that Revlon's CFO's "valuation" was made in good faith.

68.     The American Crew IP Sale-Leaseback Transaction had the effect of stealing the 2016 Term Lenders' collateral and stripping away the 2016 Term Lenders' first-priority lien on the American Crew IP.  This theft of the 2016 Term Lenders' security interest in valuable collateral was done *without* their consent.  Absent such consent, the 2016 Credit Agreement expressly prohibited RCPC and its Restricted Subsidiaries from transferring the American Crew IP and leasing it back.

69.     In correspondence with counsel for the Co-Op Lenders, neither Revlon nor Citibank claimed that the Fair Market Value of the American Crew IP was no more than $100,000,000, although they were given every opportunity to do so.  Nor is it conceivable that Ares would have accepted primary collateral with a Fair Market Value of $100,000,000 or less to secure its $200,000,000 new-money loan, particularly at a time when the 2016 Term Loans were

trading at a material discount from par (*i.e.*, mid-seventy percent).  Rather, Ares demanded and received collateral of sufficient value to cover the $200 million it was advancing.  Indeed, on information and belief, Ares representatives relayed to market participants that Ares valued the American Crew IP at more than $200 million.  Ares' valuation of the American Crew IP was based on materials obtained from Revlon.

70.     On April 6, 2020, counsel for the Co-Op Lenders requested "a detailed description of the steps taken and analysis performed by the Borrower and its board of directors (including any special committees thereof) with respect to the Proposed Refinancing Transactions, including . . . any valuations prepared or received by the Borrower and/or [Revlon, Inc.] (or their respective boards of directors) with respect to" various intellectual property assets related to the Elizabeth Arden and American Crew brands and certain other portfolio brands.  On April 22, 2020, counsel for Revlon replied that "no valuations have been prepared or received by the Borrower and/or [Revlon, Inc] (or their respective boards of directors) with respect to the Specified Brand Assets . . . ."  On April 27, 2020, counsel for the Co-Op Lenders replied that the Co-Op Lenders "find it hard to believe [there are no such written materials], including because certain of those assets were collateral with respect to the 2019 term loan facility provided by Ares . . ." and further requested that Revlon "please provide [the Co-Op Lenders] with the value of the American Crew intellectual property as of the date it was transferred in connection with the Ares Financing, as well as an explanation of how the Ares Financing did not violate Section 7.10 of the 2016 Credit Agreement."  On April 28, 2020, counsel for Revlon ignored the explicit request for the value of the American Crew IP, responding, without expounding, that the American Crew IP Sale-Leaseback Transaction "was not a sale leaseback transaction in violation of Section 7.10" because

"Section 7.10, by its express terms, has no application to licenses of intellectual property or the transaction structure used in the Ares Financing."

71.     It is clear, however, that leases are not restricted to "real property," as evidenced by the fact that Section 7.10 applies well beyond real property (which is a defined term the parties chose *not* to use in the sale/leaseback covenant) and includes intellectual property (also, a defined term the parties chose *not* to exclude from the sale/leaseback covenant).  The parties' use of the term "lease" was not intended to restrict its application to real property: Section 7.10 applies to "real *or personal Property*" and "Property" is defined as "*any right or interest in or to property or assets of any kind whatsoever*, whether real, personal or mixed and *whether tangible or intangible*, including Capital Stock."  2016 Credit Agreement § 1.01, at 49 (emphasis added).  The American Crew IP constituted personal Property to which Section 7.10 applies.

72.     Moreover, Revlon counsel's conclusory assertion that Section 7.10 did not apply to the American Crew IP Sale-Leaseback Transaction's "structure" is incorrect.  Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . .  [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . . . to such Person . . . ."  2016 Credit Agreement § 7.10.  Under the American Crew IP Sale-Leaseback Transaction, RCPC transferred the American Crew IP to BrandCo, a "Person."   In turn, BrandCo leased the American Crew IP back to RCPC.  Therefore, the American Crew IP Sale-Leaseback Transaction violated Section 7.10.

73.     The American Crew IP Sale-Leaseback Transaction was an Event of Default under the 2016 Credit Agreement.  Section 8.1 of the 2016 Credit Agreement provides that it is an Event

of Default "[i]f any of the following events shall occur and be continuing . . . : The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in . . . Section 7." Therefore, RCPC's breach of Section 7.10 of the 2016 Credit Agreement was and is an Event of Default under Section 8.1 of the 2016 Credit Agreement. Hereinafter, this Event of Default with respect to the 2019 Credit Agreement shall be referred to as a "Sale-Leaseback Default" (and, together with additional breaches of the prohibitions on such transactions, as the "Sale-Leaseback Defaults").

74.     The American Crew IP Sale-Leaseback Transaction was an entirely circular sale-leaseback transaction with no legitimate business purpose.[6] The illegitimate purpose of the American Crew IP Sale-Leaseback Transaction was to strip the 2016 Term Loan Facility lenders' lien on the American Crew IP so that the American Crew IP could instead be pledged to Ares.

75.     In addition to constituting an Event of Default under the 2016 Credit Agreement, the American Crew IP Sale-Leaseback Transaction violated the covenant of good faith and fair dealing inherent in the 2016 Credit Agreement. Under New York law, which governs the 2016 Credit Agreement, each party to a contract has an implied duty of good faith and fair dealing in its performance and its enforcement of the contract. The covenant embraces a pledge that no parties shall do anything that will have the effect of destroying or injuring the right of the other parties to receive the fruits of the contract. The American Crew IP Sale-Leaseback Transaction was designed to deprive 2016 Term Lenders of the protection of the first-priority liens that they specifically bargained for, and upon which they relied in extending credit to RCPC. In simple

---

[6] The 2020 Amendment concedes that such transactions serve no legitimate business purpose. It expressly states, "for the avoidance of doubt," "financing arrangements" are *not* "legitimate business purposes" that might be exempted from negative covenants barring the contribution and/or licensing of intellectual property. 2020 Amendment § 7.7(s).

terms, RCPC stole the American Crew IP so that it could induce another lender to extend credit to RCPC using the same collateral.  This breach of the implied duty of good faith and fair dealing incorporated into the 2016 Credit Agreement shall be referred to as a "Bad Faith Breach" (and, together with other breaches of the implied duty of good faith and fair dealing discussed below, as the "Bad Faith Breaches").

76.     In its role as Agent to the Lenders, Citibank was required to execute various documents in order to enable consummation of the American Crew IP Sale-Leaseback Transaction.  Citibank must have been aware that, without the 2016 Term Lender's consent, the transaction would constitute a breach of the 2016 Credit Agreement and an Event of Default thereunder.  Nonetheless, either grossly negligently or willfully Citibank failed to obtain such consent from the 2016 Term Lenders and knowingly acted to enable the completion of a transaction that plainly was barred under the 2016 Credit Agreement.  Citibank's actions were knowing and purposeful, and in breach of its obligations as Agent to the 2016 Term Lenders.

77.     The American Crew IP Sale-Leaseback Transaction constituted the "First Sale-Leaseback Default" and "First Bad Faith Breach" under the 2016 Credit Agreement.

**III.     The Sham Revolver**

78.     In early 2020, Revlon put into motion its plan to undertake a transaction that would strip the 2016 Term Lenders of their lien on the most important collateral securing their loans, and then siphon off the collateral and transfer it to a new set of subsidiaries so it could be repledged to secure loans under a new, separate term credit agreement (the "2020 BrandCo Credit Agreement").  From the outset, Revlon recognized and acknowledged that its brazen plan would require approval of the lenders in order to approve the amendment to the 2016 Credit Agreement that Revlon would adopt to effect the transaction (the "Proposed Amendment").  As described below, Revlon believed that it would be able to secure lender support by providing benefits to a subset of the 2016 Term

Lenders, effectively elevating those lenders over the other 2016 Term Lenders.  When that failed to work, Revlon devised a way to "create" new votes from friendly lenders—it issued the Sham Revolver described in detail just below.

79.     On March 9, 2020, Revlon, Inc. entered into a commitment letter with Jefferies to effectuate the transaction, and simultaneously announced the commitment through issuance of a Form 8-K disclosure.

80.     On April 14, 2020, Revlon, Inc. entered into a commitment letter with an ad hoc group of 2016 Term Lenders (the "AHG Lenders") who would serve as anchor lenders on a new credit facility and attempt to secure the required consent from the majority of 2016 Term Lenders.

### A.      The Sham Revolver Was Issued in Bad Faith Solely to Manipulate Voting

81.     The basic terms of the transaction and Proposed Amendment required the consent of the "Required Lenders," defined in the 2016 Credit Agreement as "holders of more than 50% of . . . the sum of (i) aggregate unpaid principal amount of the Term Loans then outstanding, (ii) the Revolving Commitments then in effect, if any . . . ."  2016 Credit Agreement § 1.01, at 52.[7] Because there were no Revolving Commitments when the Proposed Amendment was announced, the Proposed Amendment required the consent of holders of more than 50% of the aggregate unpaid principal amount of the 2016 Term Loans then outstanding.

82.     In an April 14, 2020 Form 8-K filing with the Securities and Exchange Commission (the "SEC"), Revlon, Inc. and RCPC acknowledged this fact:

- "[T]he funding of the Facilities is contingent on Products Corporation receiving the consent of lenders *holding more than 50% of the loans outstanding under the 2016 Term Loan Facility . . . .*"

---

[7]   Some aspects of the 2020 Amendment required the consent of the Majority Facility Lenders. "Majority Facility Lenders."  See *infra* Part IV, at page 34.

> • "The effectiveness of the Extension Amendment, and therefore the completion of
> the 2020 Refinancing Transactions, is contingent on Products Corporation
> receiving the consent of lenders *holding more than 50% of the loans outstanding*
> *under the 2016 Term Loan Facility.*"

Thus, in statements to the SEC, which have not been amended or otherwise corrected, Revlon, Inc.
and RCPC unequivocally acknowledged that the Proposed Amendment required the consent of a
majority of 2016 Term Lenders.

83.     The AHG Lenders held *less* than half of the aggregate unpaid principal amount of
Term Loans then outstanding.   Revlon nonetheless believed that securing the AHG Lenders'
support would be enough to generate a majority of the 2016 Term Lenders.   Revlon was wrong.

84.     In an apparent surprise to Revlon, the Co-Op Lenders, who constituted *more* than
50% of the 2016 Term Lenders and did not want the collateral securing their loans to be stripped
away, opposed the amendment and entered into a cooperation agreement committing to vote
against it.   Because the Co-Op Lenders constituted the Required Lenders under the 2016 Credit
Agreement, their consent was required to amend it.   Plainly, RCPC did not have the requisite
lender support to amend the 2016 Credit Agreement.   Aware that it was unable to garner the
support of a majority of 2016 Term Loan Lenders, Revlon could have chosen to negotiate to see
if there was room for a mutually beneficial solution.   Instead, Revlon sought to subvert the 2016
Credit Agreement and impose its will unilaterally and without reference to the rights of the lenders
who opposed the transaction.

85.     To be clear, up until this point in time, Revlon had spent months crafting and
negotiating this transaction without any revolving loan component under the 2016 Credit
Agreement whatsoever.   Upon realizing that RCPC would be unable to amend the 2016 Credit

Agreement without the required consents, and therefore unable to move forward with the transaction, RCPC engineered a brazenly pretextual transaction to generate a sham revolving commitment (the "Sham Revolver") that would never be drawn and that would come into existence *solely* to vote in favor of the Proposed Amendment and then *disappear* into thin air.  RCPC did so, notwithstanding its prior acknowledgment that only the outstanding term loans would be relevant to the calculation of consent required under the 2016 Credit Agreement.

86.     Revlon's motivations were an open secret.  Shortly after RCPC noticed its request to establish the Sham Revolver, one prominent financial reporting service reported, "UPDATE . . . : Revlon Seeks to Issue Incremental Debt to Dilute Majority Term Lender Group Opposing Refinancing Amendment."

87.     On April 23, 2020, RCPC noticed to Citibank, as Administrative Agent, its request to establish the Sham Revolver in the amount of $100 million.  In its notice, RCPC falsely claimed the Sham Revolver "will be used to increase liquidity to the Borrower and its Subsidiaries and for general corporate purposes."  Although the Credit Agreement sets forth a ten-business day notice period prior to giving effect to any Revolving Commitments, Citibank halved the notice period, at RCPC's request, without consulting Lenders under the Credit Agreement.

88.     Putting to rest any claim that the Sham Revolver was issued for any reason other than vote manipulation, RCPC requested that it become effective on April 30, 2020, the *same day* of the then-deadline to vote on the Proposed Amendment.  Nor could increased liquidity have been the company's true motivation.  The Proposed Amendment that RCPC was then seeking to effectuate would eliminate the 2016 Revolving Facility in its entirety and terminate RCPC's access to any revolving loans under the 2016 Credit Agreement, such that the Sham Revolver was not even going to exist for any meaningful period of time.

89.    Revlon's failure to acknowledge the true purpose of the Sham Revolver—a purpose

that was apparent to everyone—is evidence of Revlon's bad faith.

90.    On April 28, 2020, counsel for the Required Lenders wrote Citibank:

> The Proposed Revolving Commitments appear to be a sham, contemplated solely to manipulate voting on the Proposed Amendment.  Until the Borrower recognized that the Required Lenders hold in excess of 50.1% of the Loans and would not agree to the amendments that threaten to transfer away substantially all of their collateral, the Borrower did not intend to include any Revolving Facility in the Proposed Amendment.

> It is clear that the Borrower is attempting to use the newly-conceived Revolving Commitments in a transparent attempt to enlarge the pool of eligible voting Lenders, and thereby manipulate the vote on the Proposed Amendment.  At a minimum, such nefarious conduct by a Borrower breaches the implied duty of good faith and fair dealing implicit in every contract.

Citibank then provided the April 28, 2020 letter to Revlon and its counsel.

91.    After counsel for Citibank provided the April 28, 2020 letter to RCPC, RCPC

modified the Proposed Amendment so that the 2016 Credit Agreement would continue to include,

rather than eliminate, the Sham Revolver.  It was clear, however, that this modification was made

only in response to the 2016 Term Lenders' argument that the Sham Revolver was being

established only to dilute the vote of the majority of 2016 Term Lenders, and not to provide any

additional liquidity to the company.  Specifically, although the modifications permitted RCPC to

draw $65 million under the Sham Revolver, they also provided that just 10 to 15 business days

later, $65 million could be drawn down under the new term loan facility for the *exclusive purpose*

of repaying the loans outstanding under the Sham Revolver.  Rather than creating an undrawn

Sham Revolver "commitment" that would be eliminated immediately after it served its purpose of

rigging the vote on the amendment, RCPC shifted to "drawing" $65 million under the Sham

Revolver but requiring it to be immediately repaid by the new money $880 million First Lien Term

Loan (the "2020 New Money Term Loan"), a loan that RCPC could not issue without using the

Sham Revolver to rig the vote. The revised design of the transaction left no doubt that the Sham Revolver was to be issued solely to overcome the expressed will of the Required Lenders and defeat their contractual right to preclude amendments to the 2016 Credit Agreement that were not approved by a majority of the actual lenders. In substance, RCPC arranged for loans issued under the 2020 BrandCo Credit Agreement to vote their will under the 2016 Credit Agreement.

92.     The Sham Revolver was devised to rig the math in calculating the percentage of consenting lenders. RCPC issued the exact amount of revolving commitments necessary to inch over the 50.0% consent threshold: $65 million was added to the numerator and the denominator of the calculation, turning an estimated 51.5% majority into an estimated 49.9% minority.

93.     The Sham Revolver served no legitimate business purpose. It was substantially more expensive than alternative financing, including the new term loan to be created under the Proposed Amendment. Outstanding amounts under the Sham Revolver bore exorbitant interest at a rate of (x) LIBOR plus 16% or (y) an Alternate Base Rate ("ABR") plus 15%, at RCPC's option. RCPC also paid upfront fees and commitment fees to the Sham Revolver's lenders. By contrast, RCPC had access to significantly cheaper capital via an already-established $30 million Senior Line of Credit with MacAndrews & Forbes Group LLC that, when drawn, accrued interest at less than half the rate of the Sham Revolver. Upon information and belief, RCPC never drew on this significantly cheaper funding source or exhausted other existing sources of liquidity. Plainly, the Company never had any intention of keeping the newly created Sham Revolver extant for anything more than a few days—just enough time to manipulate the vote on the Proposed Amendment. To do otherwise would be utterly irrational in light of the Sham Revolver's wholly uneconomic terms. And, in keeping with Revlon's transparent intent, RCPC took out the Sham Revolver with

newly issued term loans under the 2020 Brandco Credit Agreement on May 28, 2020, exactly 15 business days after issuance of the Sham Revolver.

94.     To find that the Sham Revolver was anything but pretextual would require believing the unbelievable: that it was mere coincidence that RCPC (i) created a facility with wholly uneconomic terms vis-à-vis its available sources of liquidity, (ii) expedited the facility to come into existence on the same day as a vote to amend the 2016 Credit Agreement, which RCPC was slated to lose, (iii) structured the facility to vanish after a few days; and (iv) sized and drew on the facility in the precise amount that it needed to win that vote with 50.1% in favor.

95.     RCPC's issuance of the Sham Revolver in bad faith, solely to manipulate the voting on the Proposed Amendment, violated the implied duty of good faith and fair dealing incorporated into all contracts governed by New York law and constituted the "Second Bad Faith Breach."

### B.     Additionally, the Issuance of the Sham Revolver Was Barred by an Existing Event of Default

96.     Wholly apart and in addition to the Sham Revolver's bad faith genesis, its establishment violated the 2016 Credit Agreement's condition precedent to the creation of new Revolving Commitments.

97.     Under the 2016 Credit Agreement, the Borrower may by written notice to the Administrative Agent elect to request the establishment of Revolving Commitments.  Section 2.25(a) of the 2016 Credit Agreement states,

> The Borrower may by written notice to the Administrative Agent elect to request the establishment . . .  Revolving Commitments . . . hereunder, in an aggregate amount for all such New Loan Commitments.  Such New Loan Commitments shall become effective as of such Increased Amount Date; provided, that: **no Event of Default shall exist on such Increased Amount Date immediately after giving effect to such New Loan Commitments** . . . .

*Id.* § 2.25(a)-(b) (emphasis added). Therefore, under the 2016 Credit Agreement, the Sham Revolver could not become effective if an Event of Default existed on the day it was proposed to be established.

98.     Prior to the date the Sham Revolver was to become effective, certain 2016 Term Lenders properly issued[8] a Notice of Event of Default to Citibank, as Agent, pursuant to Section 9.5 of the 2016 Credit Agreement, that the transfer of the American Crew IP by RCPC and RCPC's leasing back the American Crew IP constituted a breach of Section 7.10 of the 2016 Credit Agreement prohibiting sale-leaseback transactions and an Event of Default under Section 8.1(c) of the 2016 Credit Agreement. Thus, the First Sale-Leaseback Default prevented the Sham Revolver from becoming effective, and therefore the Sham Revolver lenders from having votes on the amendment, even assuming, *arguendo*, the Sham Revolver was not a sham.

99.     Because an Event of Default existed at the time RCPC declared the Sham Revolver effective, issuance of the Sham Revolver was a breach of Section 2.25 of the 2016 Credit Agreement, and constituted a further Event of Default. Hereinafter, this breach of the 2016 Credit Agreement and resulting additional Event of Default shall be referred to as the "Sham Revolver Default."

100.    On May 1, 2020, prior to the voting deadline for the Proposed Amendment, counsel for the Required Lenders and Majority Facility Lenders sent a letter to counsel for the AHG Lenders, notifying them that "[b]ecause of the pre-existing Event of Default, the additional

---

[8]   An Event of Default need not be noticed by a bloc of lenders. A single lender may notice an Event of Default, at which point the Agent is deemed to have "knowledge or notice of the occurrence of [the] . . . Event of Default" and is required to "give notice thereof to the Lenders." 2016 Credit Agreement § 9.5. Nonetheless, the Event of Default was noticed by, and signed by, numerous Lenders holding more than 40% of all of the term loans under the 2016 Credit Agreement.

commitments are not effective, and the loans purported to be made by the Borrower under those commitments were not made pursuant to the 2016 Credit Agreement and are not Loans or Obligations under the 2016 Credit Agreement." The letter further stated that "the sham creation of New Revolver Commitments, undertaken solely as a subterfuge to negate the contractual rights of the majority of Lenders opposed to the proposed refinancing and associated amendments to the 2016 Credit Agreement, was inappropriate, undertaken in bad faith, and completed in breach of the plain terms of the 2016 Credit Agreement." Finally, the letter put the AHG Lenders on notice that they "may now be held responsible for [their] role in abetting this manipulation through creation of" the Sham Revolver and for their role in bringing about any improper amendment of the 2016 Credit Agreement.

101.    The AHG Lenders were not simply bystanders who voted their preferences; they were active participants in the duplicity. Not only did they have full knowledge that RCPC was establishing the Sham Revolver, a subset of the AHG Lenders were the ones who lent into it. It was RCPC *and* the AHG Lenders, guided by the experts at Jefferies, who contrived the issuance of the Sham Revolver to usurp the Co-Op Lenders constituting Required Lenders. Thus, the AHG Lenders, who negotiated the Sham Revolver with RCPC, acted with full knowledge that the Sham Revolver had been established in bad faith and was being used to manipulate the vote for the Proposed Amendment.

102.    Being parties to the 2016 Credit Agreement, the AHG Lenders, whose participation in RCPC's issuance of the Sham Revolver was in bad faith, solely to manipulate the voting on the Proposed Amendment, violated the implied duty of good faith and fair dealing incorporated into all contracts governed by New York law and constituted the "Second Bad Faith Breach," which was previously defined in relation to RCPC's corresponding conduct.

IV.    **The Amendment to the 2016 Credit Agreement Required Consent of Majority Facility Lenders, Which Was Not Obtained**

103.    The Proposed Amendment (upon effectuation, the "2020 Amendment") was invalid because it was effected only by counting the votes of holders of illusory commitments under the invalid Sham Revolver.  As such, the Proposed Amendment did not even have the consent of the Required Lenders and was therefore void.  Yet, even if the votes of lenders holding the Sham Revolver counted to establish Required Lender consent to the 2020 Amendment (which they could not), the 2020 Amendment was nonetheless invalid because it required approval of Majority Facility Lenders; *i.e.*, more than 50% of the lenders on the 2016 Term Loan.

104.    The 2016 Credit Agreement dictates that, subject to certain restrictions, the Borrower and the Required Lenders under the 2016 Credit Agreement may amend, supplement, or modify such agreement, "provided, . . . that the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities."  2016 Credit Agreement § 10.1 (the "Section 10.1 Proviso").  Hereinafter, breaches of this provision of the 2016 Credit Agreement's shall be referred to as "Section 10.1 Proviso Breaches."

105.    Because only one Facility (the 2016 Term Loan Facility) existed prior to the invalid Sham Revolver, the Section 10.1 Proviso previously had no effect on voting.  Upon the purported establishment of the Sham Revolver, however, two facilities would exist.  Therefore, the Section 10.1 Proviso would prevent any amendment that "by its terms adversely affects the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]" without the consent of the applicable Majority

Facility Lenders, here, the holders of more than 50% of the aggregate unpaid principal amount of the 2016 Term Loan Facility.

### A.    The 2020 Amendment Disproportionately Affected the 2016 Term Lenders

106.    In fact, the Proposed Amendment did "adversely affect the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."  As a result of the 2020 Amendment, RCPC now has multiple term loan facilities—the original 2016 Term Loan, an extended version of that loan for lenders who agreed to an extension, and three new term loan facilities under the 2020 BrandCo Credit Agreement.  One of the new facilities was used to "roll up"—that is, repurchase—the 2016 Term Loans of the 2016 Term Lenders who are also BrandCo Term Lenders, but not other 2016 Term Lenders.  This is in direct contravention of provisions of the 2016 Credit Agreement designed to prevent RCPC and its affiliates from repurchasing Term Loans in a manner that disproportionally favored certain Term Lenders.

107.    Under the 2016 Credit Agreement, RCPC and its affiliates could repurchase Term Loans in only two ways.  One was through "Open Market Purchases" of no more than 20% of the Term Loans.  Beyond that, RCPC could employ a Dutch Auction process to purchase Term Loans from the 2016 Term Lenders.  RCPC could not rely on either of these mechanisms to effect the roll up, however, as the roll up went to hand-picked 2016 Term Lenders, did not involve purchases on the open market, and exceeded 20% of the outstanding 2016 Term Loans.  Moreover, the targeted purchases from only BrandCo Lenders was plainly not a Dutch Auction, which had to be made available to all 2016 Term Lenders.  RCPC sought to address these failings in the 2020 Amendment both by redefining "Dutch Auction" to include the roll up and waiving the requirement to make it available to all 2016 Term Lenders.  Permitting the roll up directly affected

the Term Lenders, but had no effect on any other facility—specifically, the Revolving Credit Facility—under the 2016 Credit Agreement.

108.    Further, the 2020 Amendment gave these same favored 2016 Term Lenders the right to cause the Borrower to make additional repurchases of their 2016 Term Loans.   The reordering of priorities and provision of benefits by the 2020 Amendment affected 2016 Term Lenders only—it had no effect on the holders of the Sham Revolver commitments.

109.    The 2020 Amendment is in breach of Section 10.1's requirement for consent by Majority Facility Lenders, which Revlon never sought or obtained.   As a result, the 2020 Amendment breached the Section 10.1 Proviso and is void and unenforceable.

### B.    The Purported Waiver of Events of Default Disproportionately Affected the 2016 Term Lenders

110.    Deviously, the very first thing the 2020 Amendment purports to do is to "waive[] any Default or Event of Default that would otherwise result from the BrandCo Loan Parties entering into the BrandCo Loan Documents, and completing the transactions contemplated thereby (including, without limitation, any Specified Borrower Repurchases), on the Amendment Effective Date, and any other Default or Event of Default that may exist or may have existed prior to the Amendment Effective Date."   Amendment No. 1 to Credit Agreement § 1(a) (the "Purported Waiver").   Were it effective, the Purported Waiver would waive all existing Events of Default, including but not limited to, any Sale-Leaseback Defaults and the Sham Revolver Default.

111.    The Purported Waiver, however, is not effective.   Like the 2020 Amendment, the Purported Waiver, by its terms, "adversely affect[ed] the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."   *First*, the 2016 Term Lenders, and only the 2016 Term Lenders, had a right to assert that the Borrower violated the 2016 Credit Agreement by, among other things, entering into the

First Sale-Leaseback Default and by issuing the Sham Revolver in bad faith and notwithstanding an existing Event of Default. The Sham Revolver lenders were not impacted by the putative waiver of an Event of Default that pre-dated their own existence; nor are they impacted by the putative waiver of an Event of Default arising from the Sham Revolver itself. The Sham Revolver was created as part of the vote-rigging effort, solely to enable the adoption of the 2020 Amendment. The holders of the Revolving Commitments, by participating in and benefitting from this manipulative process, with full knowledge of the circumstances, have unclean hands, had no right to assert that the Borrower violated the 2016 Credit Agreement, and were unaffected by the Purported Waiver.

112.   *Second*, the Purported Waiver has little if any effect on the Sham Revolver lenders' rights in respect of payment because the Sham Revolver is not at risk of not being repaid. Its brief shelf life of 10 to 15 business days reduced the Sham Revolver's risk to nothing, while the 2016 Term Lenders are left exposed for years to a heightened risk of non-payment. If, for example, Revlon defaults on its debt repayments to 2016 Term Lenders when they come due, the Sham Revolver will have been repaid well before Revlon's resulting bankruptcy. The negative effects of the Purported Waiver in respect of payments disproportionately impacted the 2016 Term Lenders, while holders of the Sham Revolver's Revolving Commitments were not affected at all.

113.   Because RCPC did not even attempt to obtain consent of the majority of 2016 Term Lenders, the Purported Waiver is in breach of § 10.1's requirement for consent by Majority Facility Lenders. The Purported Waiver is void and unenforceable, and constituted a further breach of the Section 10.1 Proviso.

V.    **Citibank Defied the Directions of the Required Lenders and Majority Facility Lenders and Did Not Act in the Best Interest of the Lenders**

114.    Through a series of disloyal actions, Citibank facilitated Revlon's nefarious issuance of the Sham Revolver and helped Revlon manipulate the vote regarding the Proposed Amendment.  When the faithful actions of the 2016 Term Lenders' Agent were most needed, Citibank refused to abide by its duties or follow the directions of the Lenders holding a majority of outstanding aggregate unpaid 2016 Term Loan principal under the 2016 Credit Agreement. Instead, Citibank acted contrary to the directions of the Required Lenders and Majority Facility Lenders.

115.    On or about April 24, 2020, Donald Morgan, CIO and Managing Partner of Brigade Capital Management, LP ("BCM"), the manager of a large Co-Op Lender, discussed BCM's concerns regarding the Proposed Amendment and RCPC's bad faith attempts to rig the vote for the Proposed Amendment with Richard Zogheb, Citibank Managing Director and Head of Global Debt Capital Markets.  Mr. Zogheb offered to Mr. Morgan, who called on behalf of the Co-Op Lenders, that if a majority of 2016 Term Lenders presented a letter directing Citibank to resign, Citibank would resign as Agent prior to effectuation of the transaction.  On April 25, 2020, in reliance on and in response to Mr. Zogheb's representation, the 2016 Term Lenders holding more than 50% of outstanding aggregate unpaid 2016 Term Loan principal "direct[ed] Citibank, N.A. to resign as Agent under the 2016 Credit Agreement."

116.    On April 27, 2020, Citibank stated it was continuing to evaluate whether it would continue to serve as Agent.  Subsequently, Michael Corbat, the CEO of Citibank, confirmed to BCM that Mr. Zogheb was overseeing the resignation.  Nevertheless, notwithstanding the representations from Messrs. Zogheb and Corbat that Citibank would resign upon direction to do so, Citibank reneged, breaching its agreement to resign as Agent.

117.    On April 28, 2020, counsel for the Required Lenders warned that,

> [I]f Citi should determine to continue to act as Agent—notwithstanding the direction from Required Lenders in their letter of April 25, 2020, directing otherwise—Citi cannot join in amendments to the 2016 Credit Agreement that the Borrower has proposed.  Among other things, Borrower seeks to (a) create new Revolver Commitments notwithstanding a pending Event of Default, (b) amend the 2016 Credit Agreement in ways that are not permitted, including under the plain requirements of Section 10.1, which governs Amendments and Waivers, absent the consent of the Majority Facility Lenders, (c) employ sham Revolver Commitments to manipulate voting among Lenders in bad faith, and (d) consummate the Jefferies Financing notwithstanding its failure to provide information necessary and required to assess that transaction.  Any actions by Citi to execute, acknowledge, approve or ratify the actions and proposed amendments would violate the 2016 Credit Agreement.

As discussed *infra*, Citibank subsequently assisted RPCP in completing all of the above.  In the letter, the Co-Op Lenders further notified Citibank that such actions would be in breach of multiple provisions of the 2016 Credit Agreement, the covenant of good faith and fair dealing, and would constitute actual and constructive fraudulent transfers.

118.    On April 29, 2020, counsel for 2016 Term Lenders holding a majority of outstanding aggregate unpaid 2016 Term Loan principal under the 2016 Term Loan Facility (and thereby constituting both the Required Lenders and Majority Facility Lenders) sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement.  This Notice stated that:

> The undersigned Lenders hereby notify the Agent that the transfer of the American Crew IP by the Borrower to its Non-Guarantor Subsidiary, Beautyge II, LLC (the 'IP Transferee'), and the licensing back of the American Crew IP by the IP Transferee to the Borrower, in connection with the Ares Financing constitutes a breach of Section 7.10 of the 2016 Credit Agreement.  This breach of Section 7.10 of the 2016 Credit Agreement constitutes an Event of Default under Section 8.1(c) of the 2016 Credit Agreement.

119.    Section 9.5 of the 2016 Credit Agreement states that, "[i]n the event that an Agent receives such a notice [of an Event of Default], such Agent shall give notice thereof to the

Lenders."  Despite this requirement, Citibank did not provide notice to the 2016 Term Lenders of the Notice of the First Sale-Leaseback Event of Default.

120.    Upon information and belief, had Citibank noticed other Lenders under the 2016 Credit Agreement of this Notice of Event of Default as it was contractually required, more of the Lenders would have been aware of the continuing Event of Default, causing them to vote against the Proposed Amendment, and the 2020 Amendment would have failed, notwithstanding the issuance of the Sham Revolver.  Upon further information and belief, the inclusion of the Sham Revolver in the vote for the Proposed Amendment allowed it to pass by *less than half a percent.* Had one or more holders of a cumulative $10 million (0.5%) of the outstanding $1.8 billion 2016 Term Loan rescinded consent, the Proposed Amendment would have failed.

121.    Section 9.5 of the 2016 Credit Agreement further states that Citibank "shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders . . . provided, that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default *as it shall deem advisable in the best interests of the Lenders*" (emphasis added).

122.    Counsel for the Co-Op Lenders also informed Citibank, as Agent, that "one of the conditions precedent to the effectiveness of any New Loan Commitment under Section 2.25 of the 2016 Credit Agreement is that no Event of Default shall exist [and] the new $100 million of Revolving Commitments . . . cannot be effectuated, and the Agent cannot execute and deliver any Joinder Agreement or other documentation to cause the establishment of such Revolving Commitments."

123.    On April 30, 2020, the Co-Op Lenders again alerted Citibank that, in light of the Event of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would constitute a further Event of Default.

124.    Notwithstanding the multiple warnings sent directly to Citibank, that very day, Citibank executed and delivered a Joinder Agreement and other documentation purporting to establish the Sham Revolver in the amount of $65 million, of which RCPC drew $63.5 million. Because an Event of Default existed at the time the Sham Revolver was to be issued, in violation of a condition precedent to its issuance, the establishment of the Sham Revolver, itself, constituted another Event of Default by RCPC and Citibank.  This was the Sham Revolver Default.

125.    Citibank's refusal to follow the directions from Required Lenders to not establish the Sham Revolving Commitments constituted a breach of Section 9.5 of the 2016 Credit Agreement.

126.    Citibank tabulated the votes consenting to the Proposed Amendment.  The holders of less than 50% of the aggregate unpaid principal amount of the 2016 Term Loan Facility consented to the Proposed Amendment.  Therefore, the Proposed Amendment had the consent of neither the Majority Term Loan Facility Lenders nor the Required Lenders (the latter, because the improperly established Sham Revolver could not have been permissibly included).  Nonetheless, Citibank included the Sham Revolver in its calculations and claimed that the Required Lenders had consented to the Proposed Amendment.  Even if the Sham Revolver were eligible for inclusion in the calculation of Required Lenders, Citibank ignored the lack of consent from the Majority Facility Lenders—that is, the majority of 2016 Term Lenders—whose consent was required under the Section 10.1 Proviso to approve the Proposed Amendment that disproportionately and adversely affected the 2016 Term Lenders.

127.    The April 28, 2020 letter from counsel for the Co-Op Lenders to Citibank set forth detailed explanations of various deficiencies and breaches, and requested that "if [Citibank] disagree[s] with any of the foregoing, please promptly let us know the basis for your disagreement . . . ."   On numerous other occasions, counsel for the Co-Op Lenders warned Citibank that RCPC was expressly breaching the 2016 Credit Agreement or breaching RCPC's duty of good faith and fair dealing and that Citibank's (i) execution of documents to establish the Sham Revolver, (ii) facilitation of RCPC's vote manipulation by improperly including the Sham Revolver in the vote for the Proposed Amendment, and (iii) ratification of the amendment to the 2016 Credit Agreement, which, *inter alia*, purported to waive all existing Events of Default and release of certain of 2016 Term Lenders' liens would, themselves, constitute breaches of the 2016 Credit Agreement and Citibank's duty of good faith and fair dealing.

128.    Rather than engaging with these warnings, or providing any substantive response to the lenders for whom it was acting as Agent, Citibank *ignored* them wholesale, responding on April 29, 2020, that it "offers no opinion or comment with respect to [Co-op Lenders'] speculation regarding possible Events of Default or other misconduct by the Borrower in connection with the Proposed New Revolving Commitments or Proposed Amendment."

129.    On May 7, 2020, the Co-op Lenders provided Citibank with one last chance to do the right thing, writing that it was "six days after the vote on the Proposed Amendments and[] Citibank has had additional time to consider the invalidity of the Proposed Revolving Commitments.   We have not, however, received any indication that Citibank has done so. Similarly, during this six day period, Citibank has not contacted us to address the substantive points raised in our letters of last week, or to explain why it facilitated voting that gave effect to sham

revolving commitments issued solely to undermine the directions of an actual majority of Lenders under the 2016 Credit Agreement."

130.    Nevertheless, on May 8, 2020, Citibank reiterated that it "continues to offer no opinion or comment with respect to such matters. . . ."  Citibank established the Sham Revolver, facilitated RCPC's vote manipulation by improperly including the Sham Revolver in the vote for the Proposed Amendment, ratified the Proposed Amendment, which, *inter alia*, purported to waive all existing Events of Default, and released the 2016 Term Lenders' liens.  Neither Citibank nor its counsel ever provided a substantive justification for its conduct.  Citibank did so without investigating any underlying allegations or, by its own admission, offering any opinion in support of its conduct.  At best, this constituted gross negligence on Citibank's part and a breach of Citibank's duties under the 2016 Credit Agreement.

131.    Citibank had a significant conflict of interest, which, at least partially, explains its brazen behavior.  In April 2018, RCPC amended its $400 million 2016 ABL Facility to add $41.5 million in new senior secured Tranche B Revolving Commitments.  Citibank was one Tranche B Lender.  The Tranche B Revolving Commitments were first in, last out and the Tranche A Revolving Commitments were last in, first out, meaning that Tranche B Revolving Commitments were drawn first and paid last.  Upon any event of default triggering a prepayment of debt, Tranche B would be paid after Tranche A.  However, Tranche B was to mature on April 18, 2020, earlier than Tranche A.

132.    Contemporaneously with amending the 2016 Credit Agreement for which Citibank served as Administrative Agent and Collateral Agent for the Lenders, RCPC sought to extend the Tranche B maturity date by one month to May 18, 2020.  In exchange, the Tranche B Lenders would receive an amended interest rate 0.75% higher than the original rate for the Tranche B

Revolving Commitments, subject to a LIBOR floor of 0.75%.  Citibank agreed to act as a Replacement Lender for a Non-Extending Lender under the 2016 ABL Facility, substantially increasing its fully drawn, Tranche B Revolving Commitments thereunder to $26.25 million, to be repaid a month later, on the new maturity date.

133.    Citibank would hold significant risk for that extra month: If a mandatory prepayment was triggered under the 2016 ABL Facility prior to maturity, Citibank, as a Tranche B Lender, would be repaid last.  Moreover, as a Lender under the 2016 ABL Facility, Citibank's lien on the valuable intellectual property of Elizabeth Arden and other valuable RCPC brand assets was behind that of the 2016 Term Lenders.  A default under the either the 2016 ABL Facility or 2016 Term Loan Facility would put Citibank's $26.25 million Tranche B Loan behind a $400 million Tranche A facility in priority and, as to the intellectual property of Elizabeth Arden and other RCPC brand assets, behind the 2016 Term Lenders.  Thus, Citibank had a stake in the success of the Proposed Amendment and a reason to deny the 2016 Term Lenders their right to call a default by reason of the unlawful amendment of the 2016 Credit Agreement: a default could cause Citibank to lose up to $26.25 million.

134.    Thus, Citibank's loan to RCPC furnished motive to betray the 2016 Term Lenders to whom it owed a duty.  Citibank refused to acknowledge defaults under the 2016 Credit Agreement, recognized the Sham Revolver, and effectuated the invalid 2020 Amendment in favor of Revlon and itself.  By ignoring properly noticed defaults, recognizing the Sham Revolver, and ratifying the Proposed Amendment, Citibank put its own interest as a Tranche B ABL Lender ahead of the interests of 2016 Term Lenders.

135.    Section 9.5 of the 2016 Credit Agreement states that Citibank was to act "in the best interest of the Lenders."  Citibank's involvement in (1) refusing to resign; (2) establishing the

Sham Revolver; (3) including the Sham Revolver in the vote for the Proposed Amendment; (4) overseeing the execution of the 2020 Amendment and Pari Passu Intercreditor Agreement (see below); and (5) enabling the transfer of the 2016 Term Lenders' valuable collateral and the stripping of their lien on that collateral were indisputably not in the "best interest of lenders." Citibank's failure to act in the best interest of lenders constituted another breach of Section 9.5 of the 2016 Credit Agreement.

## VI.    The 2020 Amendment to the 2016 Credit Agreement

136.    On March 9, 2020, RCPC entered into a commitment letter with Jefferies to effectuate the transaction, and simultaneously announced the commitment through issuance of a Form 8-K disclosure that described the transaction structure.  Reflecting the extreme nature of the transaction, on information and belief, after being retained by the company, representatives of Jefferies indicated to 2016 Term Lenders that Jefferies would do "anything" to effectuate the transaction.  In recognition of the effect of the transaction—stealing the 2016 Term Loan Facility's collateral and stripping away its lien on that collateral—the secondary market for 2016 Term Loans precipitously dropped.  The secondary market price precipitously dropped again after Revlon's Form 10-K announcement on May 11, 2020, that four days earlier, the 2020 Amendment had been effectuated and that RCPC had entered into the 2020 BrandCo Credit Agreement with Revlon, Inc., Jefferies, as administrative agent and collateral agent, and the John Doe Lenders.



137.   The precipitous drop in the market price of the 2016 Term Loans simply reflected what RCPC knew when it constructed the 2020 transaction: Stealing away most, and massively diluting what remained, of the collateral securing the loans extended by the 2016 Term Lenders that those lenders bargained for and upon which they based their lending decisions, had a devastating effect on the value of the 2016 Term Loans.  The natural and obvious consequence of the transaction was to hinder and delay the 2016 Term Lenders' ability to collect on their loans to RCPC and to enforce their security rights.  RCPC, acting through its board, brought about this result knowingly and purposefully, as it was a central and inevitable piece of the transaction.  Upon execution of the transaction, Moody's downgraded the 2016 Term Loan from Caa2(LGD3) to Ca(LGD5), "reflect[ing] that the removal of the BrandCo collateral and the dilution of the security interest in the remaining collateral will weaken recovery prospects."  Its assessment of estimated "Loss Given Default" jumped from 30%-50% to 70%-90%.

138.    Exactly like the 2019 Term Loan Facility, the 2020 BrandCo Credit Agreement is predicated on the theft of collateral pledged to the lenders under the 2016 Term Loan Facility. RCPC simply replicated the American Crew IP Sale-Leaseback Transaction on a much larger scale (the "2020 BrandCo IP Sale-Leaseback Transaction").  This time, RCPC contributed the American Crew IP, as well as intellectual property related to Elizabeth Arden (the "Elizabeth Arden IP") and certain brands in RCPC's Portfolio Group and Fragrance Group (the "Other IP," and, collectively, the "BrandCo IP" or "BrandCo Collateral"), into BrandCo or the BrandCo Subsidiaries.  RCPC then leased back the BrandCo Collateral to provide for its continued use by RCPC and its subsidiaries.  As a result, the 2020 BrandCo IP Sale-Leaseback Transaction violated the prohibition against such transactions set forth in Section 7.10 of the 2016 Credit Agreement.  This constitutes the "Second Sale-Leaseback Default" and "Third Bad Faith Breach."

139.    Again, the AHG Lenders were not simply bystanders, but active participants in the scheme.  Not only did they have full knowledge that RCPC was reallocating the 2016 Term Lenders' Collateral to them, they required it.  The AHG Lenders were the counterparties negotiating the Proposed Amendment and the structure of the 2020 BrandCo Sale-Leaseback Transactions.  It was they and RCPC who engineered the transaction to steal the BrandCo Collateral from the 2016 Term Lenders.  Thus, the AHG Lenders, who negotiated the Proposed Amendment and 2020 BrandCo Sale-Leaseback Transactions with RCPC, acted with full knowledge that the Proposed Amendment and 2020 BrandCo Sale-Leaseback Transactions had been completed in bad faith.

140.    Being parties to the 2016 Credit Agreement, the AHG Lenders, whose participation in the 2020 Amendment and 2020 BrandCo Sale-Leaseback Transactions was in bad faith, violated the implied duty of good faith and fair dealing incorporated into all contracts governed by New

York law and constituted the "Third Bad Faith Breach," which was previously defined in relation to RCPC's corresponding conduct.

141.    Similarly, in designing and structuring the 2020 transaction, devising the Sham Revolver, and presenting the transaction to potential participants in the market and among the 2016 Term Lenders, Revlon and the AHG Lenders relied upon the expertise of the company's advisors at Jefferies.  Moreover, Jefferies was selected to serve as administrative agent and collateral agent under the 2020 BrandCo Credit Agreement, and to act as Lead Arranger and Bookrunner under that credit agreement.

A.    **The Coercively Obtained New 2020 Facilities**

142.    Pursuant to the 2020 BrandCo Credit Agreement, three new facilities (the "2020 Facilities") were created:

i)    First, RCPC issued a senior secured term loan facility in an initial aggregate principal amount of $815 million (the "2020 New Money Facility"), plus the amount of certain fees that have been capitalized.  All of the assets of the BrandCo Entities (including their equity and the BrandCo Collateral) were pledged to secure the 2020 New Money Facility on a first-priority basis.  The 2020 New Money Facility is also secured on a pari passu basis by the remaining assets securing the 2016 Term Loan Facility.  As explained *supra*, $65 million was initially withheld and made available 10 days after closing, for 5 days, exclusively to buy out the Sham Revolver, at which point the aggregate principal amount outstanding under the 2020 New Money Facility would be $880 million.  On May 28, 2020, the 15th day after closing, the Sham Revolver was paid down using the $65 million withheld and then drawn under the 2020 New Money Facility.  The funds not used to buy out the Sham Revolver were to be used to repay in full approximately $200 million of indebtedness outstanding under the 2019 Term Credit Agreement and pay fees and

expenses in connection with the consummation of the transaction.  The remainder was to provide liquidity for general corporate purposes, including repurchasing and retiring outstanding senior notes issued by RCPC at an interest rate of 5.75%.

ii)     Second, RCPC received commitments in respect of a senior secured term loan facility in an aggregate principal amount of $950 million (the "2020 Roll-Up Facility").  All of the assets of the BrandCo Entities (including their equity and the BrandCo Collateral) have been pledged to secure the 2020 Roll-Up Facility on a second-priority basis.  The 2020 Roll-Up Facility is also secured on a pari passu basis by the assets securing the 2016 Term Loan Facility.  The proceeds of the 2020 Roll-Up Facility are available prior to the third anniversary of the closing date to purchase at par an equivalent amount of 2016 Term Loans held by the lenders participating in the 2020 New Money Facility.

iii)     Third, RCPC issued a senior secured term loan facility in an initial aggregate principal amount of $3 million (the "2020 Junior Roll-Up Facility").  All of the assets of the BrandCo Entities (including their equity and the BrandCo Collateral) have been pledged to secure the 2020 Junior Roll-Up Facility on a third-priority basis.  The 2020 Junior Roll-Up Facility is also secured on a pari passu basis by the assets securing the 2016 Term Loan Facility.  The proceeds of the 2020 Junior Roll-Up Term Loan were used to purchase at par an equivalent amount of term loans under the 2016 Term Loan Facility held by the lenders participating in the 2020 New Money Facility.

Further, all guarantors of the 2016 Term Loan Facility guarantee the 2020 Facilities.  The 2016 Term Lenders were given the option to enter into the 2016 Extended Term Loans by extending the maturity of their loans to June 30, 2025.

143.    In addition to rigging the vote for the 2020 Amendment by issuing the Sham Revolver, Revlon also coercively structured the vote for the 2020 Amendment to enter into the 2020 BrandCo Credit Agreement.  Rather than allowing Lenders to vote separately whether to consent to the amendment and participate in the 2020 Facilities, Revlon allowed only those Lenders consenting to the amendment to participate in the 2020 Facilities.  Revlon's threat was clear:  If you do not consent to the amendment, Revlon will take your collateral and you will be ineligible to lend into the 2020 Facilities that usurped you.  A prominent financial reporting service reported, "[t]he resulting transaction involved a coercive new financing that has crushed the debt held by a sizeable group of term loan holders, favoring holders willing to lend the company new money on generous terms . . . ."

**B.      The 2020 Facilities Siphoned Off Substantially All Collateral Securing the 2016 Term Loan**

144.    As a result of the 2020 Amendment and establishment of the 2020 BrandCo Credit Agreement, the 2016 Term Lenders lost substantially all of their security and collateral.  RCPC stripped their remaining first-priority liens on the BrandCo Collateral, including the Elizabeth Arden IP, *whose acquisition was the entire purpose of the 2016 Term Loan Facility*, leaving the 2016 Term Lenders with no security interest in the BrandCo Collateral.

145.    Section 10.1(a)(C) of the 2016 Credit Agreement states that no waiver, amendment, supplement or modification of the 2016 Credit Agreement shall "release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement . . . without the written consent of all Lenders."

146.    The 2020 Amendment purports to release substantially all of the Collateral under the Guarantee and Collateral Agreement without the written consent of all Lenders.  On April 28, 2020, counsel for the Co-Op Lenders sent Citibank a letter stating that the Proposed Amendment

would release substantially all of the Collateral under the 2016 Guarantee and Collateral Agreement and that the Co-Op Lenders did not consent to this release.

147.    Despite receiving this letter, on May 7, 2020, RCPC and Citibank purported to execute a series of transactions, including the 2020 Amendment and the 2020 BrandCo Credit Agreement.  As a result of the transactions, all or substantially all of the Collateral (as defined in the 2016 Credit Agreement) under the 2016 Guarantee and Collateral Agreement was released. By failing to procure consents from all Lenders prior to releasing substantially all of the Collateral, RCPC and Citibank breached the 2016 Credit Agreement.

**C.     The 2020 Facilities Are Predicated on a Faulty Condition Precedent—the Absence of a Default on the 2016 Credit Agreement**

148.    As explained *supra* Part IV, the Purported Waiver purports to "waive[] any Default or Event of Default that would otherwise result from the Brandco Loan Parties entering into the Brandco Loan Documents, and completing the transactions contemplated thereby (including, without limitation, any Specified Borrower Repurchases), on the Amendment Effective Date, and any other Default or Event of Default that may exist or may have existed prior to the Amendment Effective Date."  Amendment No. 1 to Credit Agreement § 1(a).  Of course, the Purported Waiver that received substantially less than unanimous consent cannot waive a breach caused by the failure to procure unanimous consent.

149.    Even if unanimous Lender Consent were not required to transfer the BrandCo Collateral, the 2020 Amendment, the Purported Waiver, and the 2020 BrandCo Credit Agreement and related loan documents were nonetheless ineffective.  They are fruit of the poisonous tree, predicated on the Sham Revolver, which itself was void and ineffective.  First, the First Sale-Leaseback Default prevented the Sham Revolver from ever becoming operative.  Second, the Sham Revolver was also ineffective because it was procured in bad faith, resulting in the Second

Bad Faith Breach. Because the Sham Revolver was ineffective, the Revolving Commitments, too, were ineffective and ineligible for inclusion in the calculation of Required Lenders. The 2020 Amendment and the Purported Waiver, contained therein, and the 2020 BrandCo Credit Agreement and related loan documents therefore failed for lack of consent from the Required Lenders.

150.   Irrespective of the effectiveness of the Sham Revolver, the 2020 Amendment and Purported Waiver also failed for lack of consent from the Majority Facility Lenders, whose consent was required by the Section 10.1 Proviso. The 2020 Amendment and Purported Waiver further failed for lack of consent from all Lenders to release all or substantially all of the Collateral under the 2016 Credit Agreement. As such, the Sale-Leaseback Defaults, the Bad Faith Breaches, the Sham Revolver Default, and Section 10.1 Proviso Defaults remain uncured.

151.   The 2020 BrandCo Credit Agreement contained two applicable "Conditions Precedent to Closing": *First*, "No event of default or contravention under the 2016 Term Facility . . . ." *Second*, "The effectiveness of the 2016 Term Loan Amendments." Neither condition precedent was satisfied, rendering the 2020 BrandCo Credit Agreement, itself, ineffective.

**D.   Liens Securing the 2016 Term Loan Are Released and the Collateral Is Shifted to the New 2020 Facilities**

152.   The 2020 Amendment purportedly "authorizes and directs the Collateral Agent to release its Liens on any BrandCo Collateral . . . securing the Obligations." 2020 Amendment §1(a)(ii).

153.   On May 7, 2020, giving effect to this purported direction, Citibank improperly released the liens held for the benefit of the 2016 Term Lenders on the BrandCo Collateral.

154.     Only *after* Citibank released the liens, the BrandCo Collateral was transferred to the BrandCo Entities, and the BrandCo Entities then granted liens on that collateral to Jefferies. RCPC and its other subsidiaries granted the Pari Passu Lien.

155.     The 2020 Amendment purportedly "authorizes and instructs the Administrative Agent and the Collateral Agent to enter into a pari passu intercreditor agreement . . . with the administrative agent and collateral agent under the BrandCo Credit Agreement."   2020 Amendment § 1(b).

156.     On May 7, 2020, Citibank entered into the Pari Passu Intercreditor Agreement (the "2020 Pari Passu Intercreditor Agreement") with Jefferies.  The 2020 Pari Passu Intercreditor Agreement severely limits the 2016 Term Lenders' ability to enforce remedies upon the remaining Collateral that was not stripped for the benefit of lenders under the 2020 BrandCo Credit Agreement.  It gives power over such remedies to the 2020 Term Lenders and leaves the 2016 Term Lenders with little or no ability to give effect to their security.

### E.     RCPC Leases Back the Transferred Intellectual Property Collateral

157.     RCPC and the BrandCo Entities then entered into the 2020 BrandCo IP Sale-Leaseback Transaction, whereby RCPC contributed the BrandCo Collateral into BrandCo or the BrandCo Subsidiaries.  In violation of Section 7.10 of the 2016 Credit Agreement, RCPC then leased back the BrandCo IP to provide for its continued use by RCPC and its subsidiaries, constituting the Second Sale-Leaseback Default and Third Bad Faith Breach.

### F.     Citibank Finally Resigns After Enabling the Theft of the 2016 Term Lenders' Collateral and the Stripping of Their Lien on That Collateral

158.     On May 20, 2020, counsel for the Co-Op Lenders again directed Citibank to resign as Administrative Agent and Collateral Agent for the 2016 Credit Agreement.

159.    On May 22, 2020, Citibank sent a letter to the 2016 Term Loan Lenders stating that it would resign as Administrative Agent and Collateral Agent under the 2016 Credit Agreement.

160.    In view of Citibank's stunning conduct to facilitate Revlon's theft of substantially all of the Co-Op Lenders' collateral and failure to act in the 2016 Term Lenders' best interests, the Co-Op Lenders sought to replace Citibank with a representative who would actually represent them.  The Co-Op Lenders took immediate steps to fill the role, including selecting and submitting to RCPC the identities of at least two experienced Successor Agents.  In response, Revlon indicated that it was facilitating Citibank's replacement, but instead delayed the succession.  For the first two weeks of June 2020, Revlon claimed it was evaluating which candidate it preferred to act as Successor Agent.  In reality, it was stalling to prevent the appointment of a Successor Agent who could pursue remedies on behalf of the Co-Op Lenders.

161.    On June 19, 2020, notwithstanding Revlon's delay tactics, the Co-Op Lenders appointed a Successor Agent—UMB Bank, National Association.  Nevertheless, Citibank still refused to sign an agreement to document and facilitate the transaction without first obtaining a release from the Successor Agent.  Citibank had no right to demand such a release, and, as Citibank knew, the Successor Agent had no obligation to provide one.

162.    On June 21, 2020, Citibank's counsel distributed a draft Successor Agent Appointment and Agency Transfer Agreement ("Successor Agreement").  UMB Bank's counsel responded with comments three days later.  On June 30, counsel to Revlon circulated its comments on the Successor Agreement, which included UMB Bank's deletion of the self-dealing release demanded by Citibank.  Most important, Revlon did not assert any objection to UMB stepping in to serve as Successor Agent.  Accordingly, no later than June 30, 2020, and on several dates

thereafter, the Borrower consented to the 2016 Term Lenders' appointment of UMB Bank as Successor Agent under the 2016 Credit Agreement.

163.    Pursuant to the Required Lenders' appointment of UMB in accordance with the requirements of Section 9.9(a) of the 2016 Credit Agreement, and with the Borrower's consent, UMB Bank is the Successor Agent.  Nonetheless, Citibank has continued its attempts to prevent a smooth transition of the agent role.  For example, on July 20, 2020—a month after circulating the original draft agreement—Citibank unilaterally reinserted its unwarranted release into the Successor Agreement, and refused to sign the document without a release.  Moreover, on July 29, 2020, Citibank—unlike the Borrower—refused to approve a transfer of 2016 Term Loans to UMB Bank, trying to deprive UMB Bank of status as Lender under the 2016 Credit Agreement and thereby further interfere with UMB Bank's appointment as Successor Agent.  Citibank's refusal to consent to the transfer, notwithstanding its earlier resignation as Agent, was a patent violation of the 2016 Credit Agreement's prohibition on withholding consent unreasonably, and yet another step undertaken solely to disrupt the proper appointment of the Lenders' choice of Successor Agent and to attempt to improperly obtain for itself a completely unwarranted release for its prior conduct.  While Citibank's conduct has been egregious and disruptive, it has no had effect on UMB Bank's role as the proper Successor Agent under the 2016 Credit Agreement.

164.    On August 12, 2020, the Required Lenders under the 2016 Credit Agreement sent a further Notice of Event of Default.  Among other things, this Notice explained that various aspects of the 2020 Transaction constituted further Events of Default under the 2016 Credit Agreement, including, among other things, (1) RCPC's entry into the 2020 Amendment in violation of Section 10.1 of the 2016 Credit Agreement, (2) RCPC's incurrence of the loans under the 2020 BrandCo Credit Agreement in violation of Section 7.2 of the 2016 Credit Agreement, (3)

RCPC's incurrence of liens securing the new indebtedness under the 2020 BrandCo Credit Agreement, in violation of Section 7.3 of the 2016 Credit Agreement, and (4) the release of liens upon and transfer of the BrandCo IP to Non-Guarantor Subsidiaries, and the leasing back of the BrandCo IP to RCPC in violation of Section 7.10 of the 2016 Credit Agreement.

165.    In the August 12, 2020 Notice of Event of Default, the Required Lenders under the 2016 Credit Agreement, further directed Plaintiff UMB Bank, which had replaced Citibank as Administrative Agent and Collateral Agent under the 2016 Credit Agreement, to declare the 2016 Term Loan "due and payable" as of the date of the notice.

**VII.    RCPC Was Insolvent at the Time of the Collateral Transfers**

166.    On or around May 7, 2020, while RCPC was insolvent and facing a severe liquidity crisis compounded by the global COVID-19 pandemic, RCPC transferred the BrandCo Collateral from RCPC to the BrandCo Subsidiaries, with a security interest in such BrandCo Collateral being transferred to Jefferies, in its capacity as collateral agent for lenders under the 2020 BrandCo Credit Agreement (together, the "Voidable BrandCo Transfers").[9]  Prior to the release of their lien, which occurred prior to the transfer to the BrandCo Entities, the 2016 Term Lenders had a first-priority lien on the BrandCo Collateral.

167.    Revlon reported an operating loss of $186.2 million and net loss of $213.9 million in the first quarter of 2020.  Its reported net sales in the first quarter of 2020 declined 18.1% from the same prior-year period and adjusted EBITDA decreased 26.8%.

168.    In March 2020, Revlon announced a worldwide organizational restructuring consisting of cost-cutting, primarily through the elimination of approximately 1,000 jobs.

---

[9]    Upon information and belief, the only BrandCo Collateral not transferred to a BrandCo Subsidiary on May 9, 2020, was the American Crew IP, having already been transferred to BrandCo in connection with the American Crew IP Sale-Leaseback Transaction.

169.    The trading prices on RCPC's debt reflect both the company's current insolvency, and its insolvency prior to consummating the transaction on May 7, 2020:

- The 2016 Term Loan debt under 2016 Credit Agreement was trading at approximately 82 cents on the dollar as recently as January 24, 2020.  By March 31, 2020, it was trading at 40 cents and stayed around 40 cents until May 7, 2020. It now trades at 28 cents.

- RCPC's 6.25% senior unsecured notes were trading at approximately 70 cents on the dollar in June 2019 and 50 cents at the end of 2019.  In early May, those notes were trading at 17 cents.

- Even the debt under the 2020 Facilities demonstrates insolvency.  The 2020 Roll-Up Facility debt is trading at 61 cents on the dollar and the 2020 Junior Roll-Up Facility debt is trading at 40 cents.

170.    A company's solvency is determined by, among other methodologies, the amount by which its liabilities (debt) exceed its assets. On March 31, 2020, the face value of the debt was $3.26 billion.  The market value of debt, when trading at a significant discount to par, acts as a proxy for the value of the Company's assets; here, $1.55 billion.  Thus, by the end of the first fiscal quarter, Revlon was already insolvent based on one metric by $1.71 billion.  Revlon's first quarter 10-Q filing supports this finding, disclosing a fair value of its debt of $1.77 billion against a carrying value of $3.26 billion as of March 31, 2020.  The Company also disclosed a stockholders' deficiency of $1.44 billion.

| As of March 31, 2020 *(Revlon May 11, 2020 Form 10-Q)* | Principal | x | Price | | = | | Market Value |
|---|---|---|---|---|---|---|---|
| 2019 Term Loan Facility due 2023 | $187.70 | | $1.00 [1] | | | | $187.70 |

| | Principal | x | Price | = | Market Value |
|---|---|---|---|---|---|
| 2018 Foreign Asset-Based Term Facility due 2021 | 81.50 | | 0.52 | | 42.38 |
| 2016 ABL Facility due 2021 | 339.50 | | 0.40 | | 135.80 |
| 2016 Term Loan Facility due 2023 | 1,710.90 | | 0.40 | | 684.36 |
| Spanish Government Loan due 2025 | 0.40 | | 1.00 [1] | | 0.40 |
| **Total Secured Debt** | $2,320.00 | | | **Total Secured Debt Market Value** | $1,050.64 |
| | | | | | |
| 5.75% Senior Notes due 2021 | $498.50 | | $0.79 | | $393.82 |
| 6.25% Senior Notes due 2024 | 443.10 | | 0.24 | | 106.34 |
| **Total Unsecured Debt** | $941.60 | | | **Total Unsecured Debt Market Value** | $500.16 |
| | | | | | |
| **Total Debt** | $3,261.60 | | | **Total Debt Market Value** | $1,550.80 |

| *As of May 11, 2020* (Revlon May 11, 2020 Form 10-Q & May 11, 2020 Form 8-K) | **Principal** | **x** | **Price** | **=** | **Market Value** |
|---|---|---|---|---|---|
| 2018 Foreign Asset-Based Term Facility due 2021 | $81.50 [2] | | $0.52 [6] | | $42.38 |
| 2016 ABL Facility due 2021 | 339.50 [2] | | 0.58 | | 196.91 |
| 2016 Term Loan Facility due 2023 | 757.90 [3] | | 0.34 | | 257.69 |
| 2020 New Money Facility due 2025 | 880.00 [4] | | 1.01 | | 888.80 |
| 2020 Roll-Up Facility due 2025 | 950.00 [3] | | 0.62 | | 589.00 |
| 2020 Junior Roll-Up Facility due 2025 | 3.00 [3] | | 0.40 | | 1.20 |
| Spanish Government Loan due 2025 | 0.40 [2] | | 1.00 [1] | | 0.40 |
| **Total Secured Debt** | $3,012.30 | | | **Total Secured Debt Market Value** | $1,976.38 |
| | | | | | |
| 5.75% Senior Notes due 2021 | $498.50 [2,5] | | $0.51 | | $254.24 |
| 6.25% Senior Notes due 2024 | 443.10 [2] | | 0.18 | | $79.76 |
| **Total Unsecured Debt** | $941.60 | | | **Total Unsecured Debt Market Value** | $333.99 |
| | | | | | |
| **Total Debt** | $3,953.90 | | | **Total Debt Market Value** | $2,310.37 |

[1] Lacking trading data, it is conservatively assumed this loan is trading at par.
[2] RCPC has not disclosed any debt repurchase or retirement that has occurred since March 31, 2020.  It is assumed that the balance on May 11, 2020 is the same as on March 31, 2020.
[3] It is assumed that on May 7, 2020, $950 million of 2016 Term Loan Facility is rolled up into 2020 Roll-Up Facility and $3 million of 2016 Term Loan Facility into 2020 Junior Roll-Up Facility.

[4] Includes Sham Revolver.
[5] Some proceeds of 2020 New Money Facility are to be used to repurchase and retire outstanding 5.75% Senior Notes due 2021, but RCPC has not disclosed any such occurrence.

171.    As a result of the depth of RCPC's insolvency, including the lack of any prospect for RCPC to pay its debts as they come due for an indeterminate period, any equity interests in the Company were effectively extinguished.  Thus, RCPC's residual beneficiaries were its creditors.

172.    Like RCPC, the BrandCo Entities are deeply insolvent, and were insolvent at the time the BrandCo Collateral was transferred to them in view of the fact that the BrandCo Entities guaranteed all three of the new term loan facilities under the 2020 BrandCo Credit Agreement, which indebtedness, in the aggregate, far exceeded the value of BrandCo Entities' only assets, the BrandCo IP.  The trading prices of the junior loans under the 2020 BrandCo Credit Agreement— as noted above, between .40 and .62 cents on the dollar—reflect clearly the fact that the BrandCo Entities' debt exceeds their assets, thus resulting in depressed, significantly sub-par trading levels for debt secured by the assets of the BrandCo Entities.

173.    RCPC used the proceeds of the 2020 New Money Facility to:

(i)     pay Ares in full approximately $200 million of indebtedness outstanding under the 2019 Term Credit Agreement, as well as amounts on account of the "Applicable Premium" under the 2019 Credit Agreement, which obligation never should have arisen and which amount arose without providing any value to RCPC (the "Voidable Ares Premium Transfer");

(ii)     repurchase approximately $50 million of its unsecured debt that was trading

at pennies on the dollar, which was owned by lenders under the 2020

BrandCo Credit Agreement;

(iii)    pay tens of millions of dollars in fees and expenses in connection with the

2020 Amended Credit Agreement, the 2020 BrandCo Credit Agreement,

and transactions associated therewith (the "Voidable Fee Transfers").

174.     The COVID-19 pandemic and the resulting collapse in revenues and earnings

exacerbated RCPC's massive leverage problem, and further incentivized the gambits by RCPC

described above to hinder, delay, and defraud its creditors.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract –
### Section 7.10, 2016 Credit Agreement –
### American Crew IP Sale-Leaseback Transaction
(Against RCPC)

175.     Plaintiff repeats and realleges the foregoing allegations as though they were fully

set forth in this paragraph.

176.     At all relevant times following the execution of the 2016 Credit Agreement, RCPC,

Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

177.     On August 6, 2019, RCPC entered into the 2019 Term Loan Facility with Ares, in

an initial aggregate principal amount of $200 million.  As part of the 2019 Term Loan Agreement,

RCPC entered into the American Crew IP Sale-Leaseback Transaction.  To effectuate the

American Crew IP Sale-Leaseback Transaction, RCPC assigned and transferred all of its rights,

title, and interests in the American Crew IP to its Restricted Subsidiary, BrandCo.  RCPC entered

into a license and royalty arrangement with BrandCo to provide for RCPC's exclusive,

nontransferrable, continued use of the American Crew IP during the term of the 2019 Term Loan Facility. The license and royalty arrangement constituted a "lease," under the terms of Section 7.10. Prior to the American Crew IP Sale-Leaseback Transaction, the American Crew IP had been owned by a Guarantor Subsidiary of RCPC. The 2016 Term Lenders had a first-priority lien on the American Crew IP. By contributing the American Crew IP from one of RCPC's Guarantor Subsidiaries, on whose assets the 2016 Term Lenders had a first-priority lien, to BrandCo, on whose assets Ares had first-priority liens, RCPC stripped away the 2016 Term Lenders' first-priority lien on the American Crew IP.

178.     Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . . . to such Person . . . , except for . . . any such arrangement to the extent that the Fair Market Value of such Property does not exceed the greater of (i) $100,000,000 and (ii) 3.0% of Consolidated Total Assets at the time of such event . . . ." 2016 Credit Agreement § 7.10. Under the American Crew IP Sale-Leaseback Transaction, RCPC and its Restricted Subsidiary BrandCo Holdings transferred the American Crew IP to BrandCo, a "Person." BrandCo, "such Person," leased the American Crew IP to RCPC.

179.     Under the terms of Section 7.10, the American Crew IP constituted "personal Property" that was "transferred" and the license and royalty arrangement constituted a "lease." The Fair Market Value of the American Crew IP exceeded both $100,000,000 and 3.0% of Consolidated Total Assets at the time of such event in the aggregate. Therefore, the American Crew IP Sale-Leaseback Transaction violated Section 7.10.

180.     2016 Term Lenders suffered substantial damages as a direct and proximate result of RCPC's breach of Section 7.10 of the 2016 Credit Agreement in an amount to be proven at trial. Such damages include fees and costs incurred by 2016 Term Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC. The damages suffered by 2016 Term Lenders are such that there is no complete or adequate remedy at law.

181.     Plaintiff seeks and is entitled to specific performance under the 2016 Credit Agreement, including a return of priority liens and property interests on American Crew IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement that were stripped from 2016 Term Lenders in connection with the 2019 Term Loan Agreement and related transactions, including the American Crew IP Sale-Leaseback Transaction.

182.     In the alternative, to the extent it is determined that there is an adequate remedy at law, Plaintiff seeks compensatory or rescissory damages.


**SECOND CAUSE OF ACTION**
**Declaratory Judgment –**
**Event of Default based on Section 8.1(c), 2016 Credit Agreement–**
**First Sale-Leaseback Default**
**(Against RCPC)**

183.     Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

184.     Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

185.     An actual and justiciable controversy presently exists between Plaintiff and RCPC concerning whether the transaction completed in 2019, incorporating the sale-leaseback of the American Crew IP, constitutes an Event of Default under the 2016 Credit Agreement.

186.    A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations herein.

187.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

188.    On August 6, 2019, RCPC entered into the 2019 Term Loan Facility with Ares, in an initial aggregate principal amount of $200 million.  As part of the 2019 Term Loan Agreement, RCPC entered into the American Crew IP Sale-Leaseback Transaction.  To effectuate the American Crew IP Sale-Leaseback Transaction, RCPC assigned and transferred all of its right, title, and interest in the American Crew IP to its Restricted Subsidiary, BrandCo.  RCPC entered into a license and royalty arrangement with BrandCo to provide for RCPC's exclusive, nontransferrable, continued use of the American Crew IP during the term of the 2019 Term Loan Facility.  The license and royalty arrangement constituted a "lease," under the terms of Section 7.10.  Prior to the American Crew IP Sale-Leaseback Transaction, the American Crew IP had been owned by a Guarantor Subsidiary of RCPC.  The 2016 Term Lenders had a first-priority lien on the American Crew IP.  By contributing the American Crew IP from one of RCPC's Guarantor Subsidiaries, on whose assets the 2016 Term Lenders had a first-priority lien, to BrandCo, on whose assets Ares had first-priority liens, RCPC stripped away the 2016 Term Lenders' first-priority lien on the American Crew IP.

189.    Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . . . to such Person . . . , except for . . . any such arrangement to the extent that the Fair

Market Value of such Property does not exceed the greater of (i) $100,000,000 and (ii) 3.0% of Consolidated Total Assets at the time of such event . . . ." 2016 Credit Agreement § 7.10. Under the American Crew IP Sale-Leaseback Transaction, RCPC and its Restricted Subsidiary BrandCo Holdings transferred the American Crew IP to BrandCo, a "Person." BrandCo, "such Person," leased the American Crew IP to RCPC. Therefore, the American Crew IP Sale-Leaseback Transaction violated Section 7.10.

190.    Under the terms of Section 7.10, the American Crew IP constituted "personal Property" that was "transferred" and the license and royalty arrangement constituted a "lease." The Fair Market Value of the American Crew IP exceeded both $100,000,000 and 3.0% of Consolidated Total Assets at the time of such event in the aggregate.

191.    Section 8.1 of the 2016 Credit Agreement states, "Events of Default. If any of the following events shall occur and be continuing . . . The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in Section 6.4(a) (solely with respect to maintaining the existence of the Borrower) or Section 7 or Holdings shall default in the observance or performance of any agreement contained in Section 7A." Therefore, RCPC's breach of Section 7.10 of the 2016 Credit Agreement is an Event of Default under Section 8.1 of the 2016 Credit Agreement. It constituted the "First Sale-Leaseback Default."

192.    On April 29, 2020, certain Lenders sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement. This Notice stated that "[t]he undersigned Lenders hereby notify the Agent that the transfer of the American Crew IP by the Borrower to its Non-Guarantor Subsidiary, Beautyge II, LLC (the 'IP Transferee'), and the licensing back of the American Crew IP by the IP Transferee to the Borrower, in connection with the Ares Financing constitutes a breach of Section 7.10 of the

2016 Credit Agreement.  This breach of Section 7.10 of the 2016 Credit Agreement constitutes an Event of Default under Section 8.1(c) of the 2016 Credit Agreement."

193.    Plaintiff is thus entitled to a declaration that RCPC breached Section 7.10 of the 2016 Credit Agreement through the consummation of the American Crew IP Sale-Leaseback Transaction.

194.    Plaintiff is further entitled to a declaration that RCPC's breach of Section 7.10 of the 2016 Credit Agreement constituted an "Event of Default" under Section 8.1 of the 2016 Credit Agreement.

195.    Plaintiff is further entitled to a declaration that Lenders' Notice of Event of Default sent on April 29, 2020 was a proper and effective Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement.

### THIRD CAUSE OF ACTION
### Breach of Contract –
### Section 2.25, 2016 Credit Agreement –
### Establishing Sham Revolver
### (Against RCPC)

196.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

197.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

198.    Under the 2016 Credit Agreement, the Borrower may by written notice to the Administrative Agent elect to request the establishment of Revolving Commitments.  Section 2.25 of the 2016 Credit Agreement states that "[t]he Borrower may by written notice to the Administrative Agent elect to request the establishment of … Revolving Commitments … hereunder, in an aggregate amount for all such New Loan Commitments.  Such New Loan

Commitments shall become effective as of such Increased Amount Date; provided, that: *no Event of Default shall exist on such Increased Amount Date immediately after giving effect to such New Loan Commitments* and the making of any New Loans pursuant thereto and any transaction consummated in connection therewith subject to the Permitted Acquisition Provisions (as defined below) and the Limited Condition Acquisition Provision, in connection with any acquisition or investment being made with the proceeds thereof" (emphasis added).   Therefore, Revolving Commitments could not become effective if an Event of Default existed on the day they were to be established.

199.    On April 23, 2020, RCPC noticed to Citibank, as Administrative Agent, its request to establish the Sham Revolver in the amount of $100 million, pursuant to the terms of Section 2.25 of the 2016 Credit Agreement.   The Sham Revolver was to become effective on April 30, 2020.

200.    On April 29, 2020, certain Lenders sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement.   This Notice stated, amongst other things, that "[t]he undersigned Lenders hereby notify the Agent that the transfer of the American Crew IP by the Borrower to its Non-Guarantor Subsidiary, Beautyge II, LLC (the 'IP Transferee'), and the licensing back of the American Crew IP by the IP Transferee to the Borrower, in connection with the Ares Financing constitutes a breach of Section 7.10 of the 2016 Credit Agreement.   This breach of Section 7.10 of the 2016 Credit Agreement constitutes an Event of Default under Section 8.1(c) of the 2016 Credit Agreement."

201.    On April 30, 2020, the lenders again alerted Citibank that, in light of the Event of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would constitute a further Event of Default.

202.     Notwithstanding the multiple warnings sent directly to Citibank, on April 30, 2020, Citibank executed and delivered a Joinder Agreement and other documentation purporting to establish the Sham Revolver in the amount of $65 million, of which RCPC drew $63.5 million. Because an Event of Default existed at the time the Sham Revolver was to be issued, in violation of a condition precedent to its issuance, the establishment of the Sham Revolver was invalid and therefore RCPC's purported issuance of, and drawing upon, the Sham Revolver constituted breaches of Section 2.25 and another Event of Default by RCPC.  This was the Sham Revolver Default.

203.     As a result of the issuance of the Sham Revolver, the 2020 Amendment was adopted although the holders of less than 50% of the aggregate unpaid principal amount of the 2016 Term Loan Facility consented to it.  Therefore, the 2020 Amendment had the consent of neither the Majority Term Loan Facility Lenders nor the Required Lenders (the latter, because the improperly established Sham Revolver could not have been permissibly included).  Therefore, the issuance of the Sham Revolver proximately caused the adoption of the 2020 Amendment and the harms to the 2016 Term Lenders contained therein.

204.     The 2016 Term Lenders have suffered substantial damages as a direct and proximate result of RCPC's breach of Section 2.25 of the 2016 Credit Agreement in an amount to be proven at trial.  Such damages include fees and costs incurred by 2016 Term Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC.  The damages suffered by 2016 Term Lenders are such that there is no complete or adequate remedy at law.

205.     If the Sham Revolver had not been issued in breach of Section 2.25 of the 2016 Credit Agreement, RCPC would not have been able to engage in their vote rigging scheme and

therefore would not have been able to execute the Proposed Amendment. Plaintiff is therefore further entitled to the rescission of the 2020 Amendment.

206.     Plaintiff seeks and is entitled to specific performance under the 2016 Credit Agreement, including a return of priority liens and property interests on BrandCo Collateral and other collateral that the 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement and that were stripped from 2016 Term Lenders or massively diluted in connection with the 2020 Amendment and related transactions that would not have been possible without the establishment of the Sham Revolver.

207.     In the alternative, to the extent it is determined that there is an adequate remedy at law or that rescission is impracticable, Plaintiff seeks compensatory or rescissory damages.

## FOURTH CAUSE OF ACTION
### Declaratory Judgment –
### Event of Default based on Section 8.1, 2016 Credit Agreement–
### Sham Revolver Default
#### (Against RCPC)

208.     Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

209.     Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

210.     An actual and justiciable controversy presently exists between Plaintiff and RCPC concerning whether issuance of the Sham Revolver was in violation of Section 8.1 of the 2016 Credit Agreement and constituted an Event of Default under the 2016 Credit Agreement.

211.     A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations herein.

212.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

213.    Under the 2016 Credit Agreement, the Borrower may by written notice to the Administrative Agent elect to request the establishment of Revolving Commitments.  Section 2.25 of the 2016 Credit Agreement states that "[t]he Borrower may by written notice to the Administrative Agent elect to request the establishment of … Revolving Commitments … hereunder, in an aggregate amount for all such New Loan Commitments.  Such New Loan Commitments shall become effective as of such Increased Amount Date; provided, that: ***no Event of Default shall exist on such Increased Amount Date immediately after giving effect to such New Loan Commitments*** and the making of any New Loans pursuant thereto and any transaction consummated in connection therewith subject to the Permitted Acquisition Provisions (as defined below) and the Limited Condition Acquisition Provision, in connection with any acquisition or investment being made with the proceeds thereof" (emphasis added).  Therefore, Revolving Commitments could not become effective if an Event of Default existed on the day they were to be established.

214.    On April 23, 2020, RCPC noticed to Citibank, as Administrative Agent, its request to establish the Sham Revolver in the amount of $100 million, pursuant to the terms of Section 2.25 of the 2016 Credit Agreement.  The Sham Revolver was to become effective on April 30, 2020.

215.    On April 29, 2020, certain Lenders sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement.  This Notice stated, amongst other things, that "[t]he undersigned Lenders hereby notify the Agent that the transfer of the American Crew IP by the Borrower to its Non-Guarantor

Subsidiary, Beautyge II, LLC (the 'IP Transferee'), and the licensing back of the American Crew IP by the IP Transferee to the Borrower, in connection with the Ares Financing constitutes a breach of Section 7.10 of the 2016 Credit Agreement.  This breach of Section 7.10 of the 2016 Credit Agreement constitutes an Event of Default under Section 8.1(c) of the 2016 Credit Agreement."

216.    On April 30, 2020, certain Lenders again alerted Citibank that, in light of the Event of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would constitute a further Event of Default.

217.    Notwithstanding the multiple warnings sent directly to Citibank, that very day, Citibank executed and delivered a Joinder Agreement and other documentation purporting to establish the Sham Revolver in the amount of $65 million, of which RCPC drew $63.5 million. Because an Event of Default existed at the time the Sham Revolver was to be issued, in violation of a condition precedent to its issuance, the establishment of the Sham Revolver was invalid and therefore RCPC's issuance of, and drawing upon, the Sham Revolver constituted breaches of Section 2.25 and another Event of Default by RCPC.

218.    Section 8.1 of the 2016 Credit Agreement states, in part, "Events of Default.  If any of the following events shall occur and be continuing: . . .  Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document … and such default shall continue unremedied for a period of 30 days after such Loan Party receives from the Administrative Agent or the Required Lenders notice of the existence of such default."

219.    RCPC's breach of Section 2.25 of the 2016 Credit Agreement is a failure of RCPC to observe or perform under the 2016 Credit Agreement and therefore is an "Event of Default" under Section 8.1 of the Credit Agreement.  This was the Sham Revolver Default.

220.     On August 12, 2020, the Required Lenders under the 2016 Credit Agreement sent Plaintiff UMB Bank, the new administrative agent under the 2016 Credit Agreement, a Notice of Event of Default stating that "[t]o the extent the Purported Revolving Commitments are somehow deemed to be effective under the 2016 Credit Agreement, notwithstanding section 2.25's prohibition, there exists an additional Event of Default pursuant to section 8.1(d) as a result of the Borrower's failure to observe and/or perform in compliance with section 2.25 of the 2016 Credit Agreement."

221.     Plaintiff is thus entitled to a declaration that (a) the Sham Revolver was invalid and thus holders of Revolving Commitments under the Sham Revolver could not vote on the 2020 Amendment, and (b) RCPC breached Section 2.25 of the 2016 Credit Agreement by establishing the Sham Revolver even though there was an outstanding Event of Default noticed under the 2016 Credit Agreement.

222.     Plaintiff is further entitled to a declaration that RCPC's breach of Section 2.25 of the 2016 Credit Agreement constituted an "Event of Default" under Section 8.1 of the 2016 Credit Agreement.

223.      Plaintiff is further entitled to a declaration that the Notice of Event of Default sent on August 12, 2020 is a proper Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement.

224.     Plaintiff is further entitled to a declaration that Lenders' direction, contained in the August 12, 2020 Notice of Event of Default, to declare the 2016 Term Loan "due and payable" as of the date of the Notice was proper and effective.

## FIFTH CAUSE OF ACTION
## Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against RCPC, Citibank, and the AHG Lenders)

225.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

226.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, AHG Lenders, and Co-Op Lenders were parties to the 2016 Credit Agreement.

227.    Co-Op Lenders have performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the 2016 Credit Agreement.

228.    Implicit in all contracts governed by New York law is a covenant of good faith and fair dealing in the course of contract performance.  The covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

229.    RCPC, Citibank, and the AHG Lenders materially breached the implied covenant of good faith and fair dealing by purporting to establish and committing to fund the Sham Revolver, which was undertaken solely to manipulate the vote on the Proposed Amendment and to overcome the expressed opposition of the majority of Lenders to the Proposed Amendment. This bad faith conduct was willful, intentional, and material, or otherwise grossly negligent in performance of, or in reckless disregard to, Defendants' obligations and duties under the 2016 Credit Agreement.

230.    The basic tenets of the 2020 Transaction and amendment of the 2016 Credit Agreement required the consent of the Required Lenders, defined in the 2016 Credit Agreement as "holders of more than 50% of . . . the sum of (i) aggregate unpaid principal amount of the Term Loans then outstanding, (ii) the Revolving Commitments then in effect, if any . . . ."   2016 Credit

Agreement § 1.01, at 52.  Because there were no Revolving Commitments when the amendment was announced, the Proposed Amendment required the consent of more than 50% of the sum of the aggregate unpaid principal amount of the Term Loans then outstanding.  Revlon, Inc. and RCPC disclosed in an April 14, 2020 Form 8-K filing with the SEC that the Proposed Amendment required consent of lenders "holding more than 50% of the loans outstanding under the 2016 Term Loan Facility."

231.    The Co-Op Lenders constituted the Required Lenders under the 2016 Credit Agreement, whose consent was required to amend it (as acknowledged by Revlon).  The Co-Op Lenders opposed the Proposed Amendment.  The AHG Lenders in support of the Proposed Amendment held less than 50% of the loans outstanding under the 2016 Term Loan Facility. Plainly, RCPC did not have the requisite lender support to amend the 2016 Credit Agreement.

232.    In response to its inability to amend the 2016 Credit Agreement, RCPC and the AHG Lenders engineered a brazenly pretextual transaction to purportedly generate the Sham Revolver that would come into existence *solely* to vote in favor of the Proposed Amendment and then *disappear* into thin air.  RCPC and the AHG Lenders did so, notwithstanding their prior acknowledgment that only the outstanding term loans would be relevant to the calculation of consent required under the 2016 Credit Agreement.

233.    The Sham Revolver plainly served no legitimate business purpose.  The Company and the AHG Lenders never had any intention of keeping the newly created Sham Revolver extant for anything more than a few days—just enough time to manipulate the vote on the Proposed Amendment.  To do otherwise would be utterly irrational in light of the Sham Revolver's wholly uneconomic terms.  Indeed, RCPC took out the Sham Revolver with new term loans issued by the

AHG Lenders under the 2020 BrandCo Credit Agreement on May 28, 2020, exactly 15 business days after issuance of the Sham Revolver.

234.    On numerous other occasions, counsel for the Co-Op Lenders (constituting Required Lenders) warned Citibank that RCPC was expressly breaching the 2016 Credit Agreement or breaching RCPC's duty of good faith and fair dealing and that Citibank's (i) execution of documents to establish the Sham Revolver, (ii) facilitation of RCPC's vote manipulation by improperly including the Sham Revolver in the vote for the Proposed Amendment, and (iii) ratification of the 2020 Amendment, which, *inter alia*, purported to waive all existing Events of Default and release of certain of the 2016 Term Lenders' liens would, themselves, constitute breaches of the 2016 Credit Agreement and breach Citibank's duty of good faith and fair dealing.

235.    On May 1, 2020, prior to the voting deadline for the Proposed Amendment, counsel for the Required Lenders and Majority Facility Lenders contacted counsel for the AHG Lenders to notify the AHG Lenders that "the sham creation of New Revolver Commitments, undertaken solely as a subterfuge to negate the contractual rights of the majority of Lenders opposed to the proposed refinancing and associated amendments to the 2016 Credit Agreement, was inappropriate, undertaken in bad faith, and completed in breach of the plain terms of the 2016 Credit Agreement."   Finally, counsel for the Required Lenders and Majority Facility Lenders warned the AHG Lenders that they "may now be held responsible for [their] role in abetting this manipulation through creation of" the Sham Revolver and for their role in bringing about any improper amendment of the 2016 Credit Agreement.

236.    Notwithstanding the multiple warnings sent directly to Citibank, on April 30, 2020, Citibank executed and delivered a Joinder Agreement and other documentation purporting to

establish the Sham Revolver.  The AHG Lenders lent into the Sham Revolver and used the Sham Revolver to vote in favor of the Proposed Amendment.  They did this to enable RCPC to complete the 2020 Transaction, which, at its core, deprived the 2016 Term Lenders of the Collateral they had bargained for, and upon which they relied in lending money to RCPC.

237.    Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's, Citibank's, and the AHG Lenders' breaches of the implied covenant of good faith and fair dealing in an amount to be proven at trial.  Such damages include fees and costs incurred by Co-Op Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC.  The damages suffered by Co-Op Lenders are such that there is no complete or adequate remedy at law.

238.    If the Sham Revolver had not been issued in breach of the implied covenant of good faith and fair dealing, RCPC would not have been able to engage in their vote rigging scheme and therefore would not have been able to execute the Proposed Amendment.  Plaintiff is therefore further entitled to the rescission of the 2020 Amendment.

239.    Plaintiff seeks and is entitled to specific performance under the 2016 Credit Agreement, including a return of priority liens and property interests on BrandCo Collateral and other collateral that the 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement and that were stripped from 2016 Term Lenders or massively diluted in connection with the 2020 Amendment and related transactions that would not have been possible without the establishment of the Sham Revolver.

240.    In the alternative, to the extent it is determined that there is an adequate remedy at law or that rescission is impracticable, Plaintiff seeks compensatory or rescissory damages.

## SIXTH CAUSE OF ACTION
### Breach of Contract –
### Section 7.10, 2016 Credit Agreement –
### BrandCo IP Sale-Leaseback Transaction
### (Against RCPC)

241.     Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

242.     At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

243.     On May 7, 2020, RCPC entered into the 2020 BrandCo Credit Agreement with the John Doe Lenders, including the AHG Lenders.  In connection with the 2020 BrandCo Credit Agreement, RCPC entered into the BrandCo IP Sale-Leaseback Transaction.  To effectuate the BrandCo IP Sale-Leaseback Transaction, RCPC assigned and transferred all of its rights, title, and interests in the BrandCo IP to its Restricted Subsidiaries, the BrandCo Subsidiaries.  Individual brand names were transferred to separate Restricted Subsidiaries, each of which was named to reflect the piece of BrandCo IP contained therein.  For example, the Mitchum intellectual property was assigned and transferred to BrandCo Mitchum 2020 LLC.  RCPC entered into license and royalty arrangements with the BrandCo Subsisdiaries to provide for RCPC's exclusive, nontransferrable, continued use of the BrandCo IP during the term of the 2020 BrandCo Credit Agreement.  The license and royalty arrangements constituted "leases," under Section 7.10 of the 2016 Credit Agreement.

244.     Prior to the BrandCo IP Sale-Leaseback Transaction, the BrandCo IP had been owned by Guarantor Subsidiaries of RCPC.  The 2016 Term Lenders had a first-priority lien on the BrandCo IP.  In order to transfer the BrandCo IP to the BrandCo Subsidiaries, on whose assets

the AHG Lenders had first-priority liens, RCPC first had to strip away the 2016 Term Lenders' first-priority lien on the BrandCo IP.[10]

245.   Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . . . to such Person . . . , except for . . . any such arrangement to the extent that the Fair Market Value of such Property does not exceed the greater of (i) \$100,000,000 and (ii) 3.0% of Consolidated Total Assets at the time of such event . . . ." 2016 Credit Agreement § 7.10. Under the BrandCo IP Sale-Leaseback Transaction, RCPC and its Restricted Subsidiaries transferred the BrandCo IP to BrandCo Subsidiaries, "Persons." The BrandCo Subsidiaries, "such Persons," leased the BrandCo IP to RCPC. Therefore, the BrandCo IP Sale-Leaseback Transaction violated Section 7.10.

246.   Under the terms of Section 7.10, the BrandCo IP constituted "personal Property" that was "transferred" and the license and royalty arrangement constituted a "lease." The Fair Market Value of the BrandCo IP exceeded both \$100,000,000 and 3.0% of Consolidated Total Assets at the time of such event in the aggregate.

247.   2016 Term Lenders suffered substantial damages as a direct and proximate result of RCPC's breach of Section 7.10 of the 2016 Credit Agreement in an amount to be proven at trial. Such damages include fees and costs incurred by 2016 Term Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC.

---

[10]   The American Crew IP did not have to be transferred as part of the BrandCo Sale-Leaseback Transaction because it already had been transferred to BrandCo as part of the American Crew IP Sale-Leaseback Transaction. It had already been poached, so it did not need to be re-poached.

The damages suffered by 2016 Term Lenders are such that there is no complete or adequate remedy at law.

248.     Plaintiff seeks and is entitled to specific performance under the 2016 Credit Agreement, including a return of priority liens and property interests on BrandCo IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement that were stripped from 2016 Term Lenders in connection with the 2020 BrandCo Credit Agreement and related transactions, including the BrandCo IP Sale-Leaseback Transaction.

249.     In the alternative, to the extent it is determined that there is an adequate remedy at law, Plaintiff seeks compensatory or rescissory damages.

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment –
### Event of Default based on Section 8.1(c), 2016 Credit Agreement –
### Second Sale-Leaseback Default
### (Against RCPC)

250.     Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

251.     Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

252.     An actual and justiciable controversy presently exists between Plaintiff and RCPC concerning whether the sale-leaseback of the BrandCo IP constituted a breach of and Event of Default under the 2016 Credit Agreement.

253.     A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations herein.

254.     At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

255.    On May 7, 2020, RCPC entered into the 2020 BrandCo Credit Agreement with the John Doe Lenders, including the AHG Lenders.  In connection with the 2020 BrandCo Credit Agreement, RCPC entered into the BrandCo IP Sale-Leaseback Transaction.  To effectuate the BrandCo IP Sale-Leaseback Transaction, RCPC assigned and transferred all of its rights, title, and interests in the BrandCo IP to its Restricted Subsidiaries, the BrandCo Subsidiaries.  Individual brand names were transferred to separate Restricted Subsidiaries, each of which was named to reflect the piece of BrandCo IP contained therein.  For example, the Mitchum intellectual property was assigned and transferred to BrandCo Mitchum 2020 LLC.  RCPC entered into license and royalty arrangements with the BrandCo Subsisdiaries to provide for RCPC's exclusive, nontransferrable, continued use of the BrandCo IP during the term of the 2020 BrandCo Credit Agreement.  The license and royalty arrangements constituted "leases," under the terms of Section 7.10 of the 2016 Credit Agreement.

256.    Prior to the BrandCo IP Sale-Leaseback Transaction, the BrandCo IP had been owned by Guarantor Subsidiaries of RCPC.  The 2016 Term Lenders had a first-priority lien on the BrandCo IP.  In order to transfer the BrandCo IP to the BrandCo Subsidiaries, on whose assets the AHG Lenders had first-priority liens, RCPC first had to strip away the 2016 Term Lenders' first-priority lien on the BrandCo IP.[11]

257.    Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted

---

[11]  As noted above, he American Crew IP had already been transferred to BrandCo as part of the American Crew IP Sale-Leaseback Transaction.

Subsidiaries . . . to such Person . . . , except for . . . any such arrangement to the extent that the Fair

Market Value of such Property does not exceed the greater of (i) $100,000,000 and (ii) 3.0% of

Consolidated Total Assets at the time of such event . . . ."  2016 Credit Agreement  § 7.10.  Under

the BrandCo IP Sale-Leaseback Transaction, RCPC and its Restricted Subsidiaries transferred the

BrandCo IP to BrandCo Subsidiaries, "Persons."   The BrandCo Subsidiaries, "such Persons,"

leased the BrandCo IP to RCPC.  Therefore, the BrandCo IP Sale-Leaseback Transaction violated

Section 7.10.

258.    Under the terms of Section 7.10, the BrandCo IP constituted "personal Property"

that was "transferred" and the license and royalty arrangement constituted a "lease."  The Fair

Market Value of the BrandCo IP exceeded both $100,000,000 and 3.0% of Consolidated Total

Assets at the time of such event in the aggregate.

259.    Section 8.1 of the 2016 Credit Agreement states, "Events of Default.  If any of the

following events shall occur and be continuing . . .   The Borrower or any Subsidiary Guarantor

shall default in the observance or performance of any agreement contained in Section 6.4(a) (solely

with respect to maintaining the existence of the Borrower) or Section 7 or Holdings shall default

in the observance or performance of any agreement contained in Section 7A."  Therefore, RCPC's

breach of Section 7.10 of the 2016 Credit Agreement is an Event of Default under Section 8.1 of

the 2016 Credit Agreement.  It constituted the "Second Sale-Leaseback Default."

260.    On August 12, 2020, the Required Lenders under the 2016 Credit Agreement sent

Plaintiff UMB Bank, the new administrative agent under the 2016 Credit Agreement, a Notice of

Event of Default stating that "the release of liens upon and transfer of the Brandco IP by the

Borrower to one or more Non-Guarantor Subsidiaries (the 'Brandco IP Transferees'), and the

licensing back of the Brandco IP by the Brandco IP Transferees to the Borrower in connection

with the Brandco Financing (the 'Brandco IP Transfer'), in violation of Section 7.10 of the 2016 Credit Agreement" was an Event of Default.

261.    Plaintiff is thus entitled to a declaration that RCPC breached Section 7.10 of the 2016 Credit Agreement through the consummation of the BrandCo IP Sale-Leaseback Transaction.

262.    Plaintiff is further entitled to a declaration that RCPC's breach of Section 7.10 of the 2016 Credit Agreement constituted an "Event of Default" under Section 8.1 of the 2016 Credit Agreement.

263.    Plaintiff is further entitled to a declaration that Lenders' Notice of Event of Default sent on August 12, 2020 was a proper and effective Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement.

264.    Plaintiff is further entitled to a declaration that Lenders' direction, contained in the August 12, 2020 Notice of Event of Default, to declare the 2016 Term Loan "due and payable" as of the date of the Notice was proper and effective.

**EIGHTH CAUSE OF ACTION**
**Breach of Contract –**
**Section 10.1(a)(C), 2016 Credit Agreement –**
**Release of Substantially All Collateral**
**(Against RCPC)**

265.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

266.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

267.    As a result of the Proposed Amendment and establishment of the 2020 BrandCo Credit Agreement, the 2016 Term Lenders lost substantially all of their security and collateral.

RCPC stripped their remaining first-priority liens on the BrandCo Collateral, including the Elizabeth Arden IP, *whose acquisition was the entire purpose of the 2016 Term Loan Facility*, leaving the 2016 Term Lenders with no security interest in the BrandCo Collateral.

268.     Section 10.1(a)(C) of the 2016 Credit Agreement states that no waiver, amendment, supplement, or modification of the 2016 Credit Agreement shall "release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders."

269.     The Proposed Amendment purports to release substantially all of the Collateral under the Guarantee and Collateral Agreement without the written consent of all Lenders.  On April 28, 2020, counsel for the Co-Op Lenders sent Citibank a letter stating that the Proposed Amendment would release substantially all of the Collateral under the 2016 Guarantee and Collateral Agreement and that the Co-Op Lenders did not consent to this release.

270.     On May 7, 2020, RCPC and Citibank purported to execute a series of transactions, including the Proposed Amendment and the 2020 BrandCo Credit Agreement.  As a result of these transactions, all or substantially all of the Collateral (as defined in the 2016 Credit Agreement) under the 2016 Guarantee and Collateral Agreement was released.  RCPC and Citibank did not receive written consent of all Lenders.  In fact, in advance of this transaction, the majority of Lenders (excluding holders of Sham Revolver Commitments) stated that they explicitly did not consent to the transaction.  By failing to procure consents from all Lenders prior to releasing all or substantially all of the Collateral, RCPC breached the 2016 Credit Agreement.

271.     2016 Term Lenders have suffered substantial damages as a direct and proximate result of RCPC's breach of Section 10.1(a)(C) of the 2016 Credit Agreement in an amount to be proven at trial.  Such damages include fees and costs incurred by 2016 Term Lenders in connection

with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC.  The damages suffered by 2016 Term Lenders are such that there is no complete or adequate remedy at law.

272.    Plaintiff seeks and is entitled to specific performance against RCPC to enforce obligations against those parties under the 2016 Credit Agreement and Collateral Agreement, including a return of liens and property interests on the BrandCo Collateral and other collateral that 2016 Term Lenders bargained for under the 2016 Credit Agreement and that were stripped from 2016 Term Lenders or massively diluted in connection with the 2020 Amendment, the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 BrandCo Credit Agreement, and the Pari Passu Intercreditor Agreement.

273.    Plaintiff is further entitled to the rescission of the 2020 BrandCo IP Sale-Leaseback Transaction and the 2020 Amendment.  These transactions could not have been consummated but for RCPC's breach of Section 10.1(a)(C).

274.    In the alternative, to the extent it is determined that there is an adequate remedy at law or that rescission is impracticable, Plaintiff seeks compensatory or rescissory damages.


**NINTH CAUSE OF ACTION**
**Declaratory Judgment –**
**Event of Default; Section 8.1(d), 2016 Credit Agreement –**
**Release of Substantially All Collateral**
**(Against RCPC)**

275.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

276.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

277.    An actual and justiciable controversy presently exists between Plaintiff and RCPC concerning the 2016 Credit Agreement.

278.    A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations herein.

279.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

280.    As a result of the 2020 Amendment and establishment of the 2020 BrandCo Credit Agreement, the 2016 Term Lenders had substantially all of their security and collateral stripped. RCPC stripped their remaining first-priority liens on the BrandCo Collateral, including the Elizabeth Arden IP, *whose acquisition was the entire purpose of the 2016 Term Loan Facility*, leaving the 2016 Term Lenders with no security interest in the BrandCo Collateral.

281.    Section 10.1(a)(C) of the 2016 Credit Agreement states that no waiver, amendment, supplement or modification of the 2016 Credit Agreement shall "release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders."

282.    The Proposed Amendment purports to release substantially all of the Collateral under the Guarantee and Collateral Agreement without the written consent of all Lenders.  On April 28, 2020, counsel for the Co-Op Lenders sent Citibank a letter stating that the Proposed Amendment would release substantially all of the Collateral under the 2016 Guarantee and Collateral Agreement and that the Co-Op Lenders did not consent to this release.

283.    On May 7, 2020, RCPC and Citibank purported to execute a series of transactions, including the Proposed Amendment and the 2020 BrandoCo Credit Agreement.  As a result of these transactions, all or substantially all of the Collateral (as defined in the 2016 Credit

Agreement) under the 2016 Guarantee and Collateral Agreement was released.  RCPC and Citibank did not receive written consent of all Lenders.  In fact, in advance of this transaction, the majority of Lenders (excluding holders of Sham Revolver Commitments) stated that they explicitly did not consent to the transaction.  By failing to procure consents from all Lenders prior to releasing all or substantially all of the Collateral, RCPC breached the 2016 Credit Agreement.

284.    Section 8.1 of the 2016 Credit Agreement states, in part, "Events of Default.  If any of the following events shall occur and be continuing: . . .  Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document . . . and such default shall continue unremedied for a period of 30 days after such Loan Party receives from the Administrative Agent or the Required Lenders notice of the existence of such default."

285.    RCPC's breach of Section 10.1(a)(C) is a failure of RCPC to perform under the 2016 Credit Agreement and therefore is an "Event of Default" under Section 8.1 of the Credit Agreement.

286.    On August 12, 2020, the Required Lenders under the 2016 Credit Agreement sent Plaintiff UMB Bank, the new administrative agent under the 2016 Credit Agreement, a Notice of Event of Default stating that "the purported transfer of the Brandco IP to the Non-Guarantor Subsidiaries in connection with the Brandco Financing and the release of the Liens thereon in connection therewith is a release of all or substantially all of the Collateral," and that failure to obtain the written consent of all Lenders constituted a violation of Section 10.1(a)(C) of the 2016 Credit Agreement.  The Notice identified this failure as an additional Event of Default.

287.    Plaintiff is thus entitled to a declaration that RCPC breached Section 10.1(a)(C) of the 2016 Credit Agreement by releasing all or substantially all of the Collateral from the 2016 Guarantee and Collateral Agreement.

288.    Plaintiff is further entitled to a declaration that RCPC's breach of Section 10.1(a)(C) of the 2016 Credit Agreement constituted an "Event of Default" under Section 8.1 of the 2016 Credit Agreement.

289.    Plaintiff is further entitled to a declaration that Lenders' Notice of Event of Default sent on August 12, 2020 is a proper Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement.

290.    Plaintiff is further entitled to a declaration that Lenders' direction, contained in the August 12, 2020 Notice of Event of Default, to declare the 2016 Term Loan "due and payable" as of the date of the Notice was proper and effective.

**TENTH CAUSE OF ACTION**
**Breach of Contract –**
**Section 10.1, 2016 Credit Agreement –**
**Failure to Obtain Consent of Majority Facility Lenders for Proposed Amendment**
**(Against RCPC)**

291.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

292.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

293.    The Section 10.1 Proviso of the 2016 Credit Agreement dictates that, subject to certain restrictions, the Borrower and the Required Lenders under the 2016 Credit Agreement may amend, supplement, or modify such agreement, "provided, . . . that the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms

adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities."  2016 Credit Agreement § 10.1, at 158.

294.    On May 7, 2020, RCPC purported to execute a series of transactions, including the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, the issuance of the Sham Revolver, the granting of the Pari Passu Lien, the 2020 Pari Passu Intercreditor Agreement, and the 2020 BrandCo Credit Agreement.

295.    The 2020 Amendment "adversely affect[ed] the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."  As a result of the 2020 Amendment, RCPC now has multiple term loan facilities—the original 2016 Term Loan, an extended version of that loan for lenders who agreed to an extension, and three new term loan facilities under the 2020 BrandCo Credit Agreement. One of the new facilities was used to "roll up"—that is, repurchase—the 2016 Term Loans of the 2016 Term Lenders who are also BrandCo Term Lenders, but not other 2016 Term Lenders. Additionally, the 2020 Amendment gives 2016 Term Lenders who are also BrandCo Term Lenders, but not other 2016 Term Lenders, the right to cause the Borrower to repurchase their 2016 Term Loans.  This reordering of priorities and provision of benefits affected 2016 Term Lenders—but not holders of the Sham Revolver commitments.

296.    Because the 2020 Amendment "adversely affects the rights" of the 2016 Term Lenders "in respect of payments hereunder in a manner different from such amendment that affects" the rights of the Sham Revolver Lenders, and because RCPC did not even attempt to obtain, let alone obtain, consent of the majority of 2016 Term Lenders, the 2020 Amendment is in

breach of the Section 10.1 requirement for consent by Majority Facility Lenders. The 2020 Amendment, accordingly, breached the Section 10.1 Proviso.

297.    Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's breach of Section 10.1 of the 2016 Credit Agreement in an amount to be proven at trial. Such damages include fees and costs incurred by Co-Op Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC. The damages suffered by Co-Op Lenders are such that there is no complete or adequate remedy at law.

298.    Plaintiff is further entitled to the rescission of the 2020 Amendment, as this amendment was a breach of Section 10.1 of the Credit Agreement.

299.    In the alternative, to the extent it is determined that there is an adequate remedy at law or that rescission is impracticable, Plaintiff seeks compensatory or rescissory damages.

## ELEVENTH CAUSE OF ACTION
### Declaratory Judgment –
### Event of Default; Section 10.1, 2016 Credit Agreement –
### Failure to Obtain Consent of Majority Facility Lenders for Proposed Amendment
### (Against RCPC)

300.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

301.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

302.    An actual and justiciable controversy presently exists between Plaintiff and RCPC concerning whether the failure to obtain the consent of Majority Facility Lenders for the Proposed Amendment constituted a breach of and Event of Default under the 2016 Credit Agreement.

303.    A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations herein.

304.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

305.    The Section 10.1 Proviso of the 2016 Credit Agreement dictates that, subject to certain restrictions, the Borrower and the Required Lenders under the 2016 Credit Agreement may amend, supplement, or modify such agreement, "provided, . . . that the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities."  2016 Credit Agreement § 10.1, at 158.

306.    On May 7, 2020, RCPC purported to execute a series of transactions, including the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, the issuance of the Sham Revolver, the granting of the Pari Passu Lien, the 2020 Pari Passu Intercreditor Agreement, and the 2020 BrandCo Credit Agreement.

307.    The 2020 Amendment "adversely affect[ed] the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."  As a result of the 2020 Amendment, RCPC now has multiple term loan facilities—the original 2016 Term Loan, an extended version of that loan for lenders who agreed to an extension, and three new term loan facilities under the 2020 BrandCo Credit Agreement. One of the new facilities was used to "roll up"—that is, repurchase—the 2016 Term Loans of the 2016 Term Lenders who are also BrandCo Term Lenders, but not other 2016 Term Lenders. Additionally, the 2020 Amendment gives 2016 Term Lenders who are also BrandCo Term

Lenders, but not other 2016 Term Lenders, the right to cause the Borrower to repurchase their 2016 Term Loans.  This reordering of priorities and provision of benefits affected 2016 Term Lenders—but not holders of the Sham Revolver commitments.

308.    Because the 2020 Amendment "adversely affects the rights" of the 2016 Term Lenders "in respect of payments hereunder in a manner different from such amendment that affects" the rights of the Sham Revolver Lenders, and because RCPC did not even attempt to obtain, let alone obtain, consent of the majority of 2016 Term Lenders, the 2020 Amendment is in breach of the Section 10.1 requirement for consent by Majority Facility Lenders.  The 2020 Amendment, accordingly, breached the Section 10.1 Proviso.

309.    Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's breach of Section 10.1 of the 2016 Credit Agreement in an amount to be proven at trial. Such damages include fees and costs incurred by Co-Op Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC. The damages suffered by Co-Op Lenders are such that there is no complete or adequate remedy at law.

310.    RCPC and Citibank's breach of Section 10.1 is a failure of Citibank and RCPC to observe or perform under the 2016 Credit Agreement and therefore is an "Event of Default" under Section 8.1 of the Credit Agreement.

311.    On August 12, 2020, the Required Lenders under the 2016 Credit Agreement sent Plaintiff UMB Bank, the new administrative agent under the 2016 Credit Agreement, a Notice of Event of Default identifying several aspects of the 2020 Amendment that "only affected the rights of Term Lenders, did so adversely, and were in respect of the right to payment," and yet "the required consents of the Majority Term Loan Lenders were never sought nor obtained."   The

Notice of Event of Default stated that the purported adoption of the 2020 Amendment accordingly violated Section 10.1(a) of the 2016 Credit Agreement and thus was an Event of Default.

312.    Plaintiff is thus entitled to a declaration that RCPC breached Section 10.1 of the 2016 Credit Agreement by adopting the 2020 Amendment without the required consent of Majority Facility Lenders.

313.    Plaintiff is further entitled to a declaration that RCPC's breach of Section 10.1 of the 2016 Credit Agreement constituted an "Event of Default" under Section 8.1 of the 2016 Credit Agreement.

314.    Plaintiff is further entitled to a declaration that the Notice of Event of Default sent on August 12, 2020 is a proper and effective Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement.

315.    Plaintiff is further entitled to a declaration that Lenders' direction, contained in the August 12, 2020 Notice of Event of Default, to declare the 2016 Term Loan "due and payable" as of the date of the Notice was proper and effective.

<u>**TWELFTH CAUSE OF ACTION**</u>
**Breach of Contract –**
**Section 10.1, 2016 Credit Agreement –**
<u>**Failure to Obtain Consent of Majority Facility Lenders for Purported Waiver**</u>
**(Against RCPC)**

316.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

317.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

318.    The Section 10.1 Proviso of the 2016 Credit Agreement dictates that, subject to certain restrictions, the Borrower and the Required Lenders under the 2016 Credit Agreement may

amend, supplement, or modify such agreement, "provided, . . . that the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities." 2016 Credit Agreement § 10.1, at 158.

319.    On May 7, 2020, RCPC and Citibank purported to execute a series of transactions, including a the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment (including the Purported Waiver), the issuance of the Sham Revolver, a 2020 Pari Passu Intercreditor Agreement, and the 2020 BrandCo Credit Agreement.

320.    The Purported Waiver is ineffective.   The Purported Waiver, by its terms, "adversely affect[ed] the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."   *First*, the 2016 Term Lenders, and only the 2016 Term Lenders, had a right to assert that the Borrower violated the 2016 Credit Agreement by, among other things, issuing the Sham Revolver in bad faith and notwithstanding an existing Event of Default.  The Sham Revolver was created as part of the vote-rigging effort, solely to enable the adoption of the Proposed Amendment.  The holders to the Revolving Commitments, by participating in and benefitting from this manipulative process, with full knowledge of the circumstances, have unclean hands, had no right to assert that the Borrower violated the 2016 Credit Agreement, and were unaffected by the Purported Waiver.

321.    *Second*, the Purported Waiver has little or no effect on the Sham Revolver's rights in respect of payments because the Sham Revolver is not at risk of not being repaid.  Its shelf-life of 10 to 15 business days reduces its risk to nothing, while the 2016 Term Lenders are left holding the bag for years.  If, for example, Revlon defaults on its debt repayments to 2016 Term Lenders

when they come due, the Sham Revolver will have been repaid well before Revlon's resulting bankruptcy.   All negative effects of the Purported Waiver in respect of payments disproportionately impacted the 2016 Term Lenders, while holders of the Sham Revolver's Revolving Commitments were not affected at all.

322.    Because the Purported Waiver "adversely affects the rights" of the 2016 Term Lenders "in respect of payments hereunder in a manner different from such amendment that affects" the rights of the Sham Revolver Lenders, and because RCPC did not even attempt to obtain, let alone obtain, consent of the majority of 2016 Term Lenders, adoption of the Purported Waiver is a breach of Section 10.1's requirement of consent by Majority Facility Lenders.  The Purported Waiver constituted a breach of the Section 10.1 Proviso.

323.    Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's breach of Section 10.1 of the 2016 Credit Agreement in an amount to be proven at trial. Such damages include fees and costs incurred by Co-Op Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC. The damages suffered by Co-Op Lenders are such that there is no complete or adequate remedy at law.

324.    Plaintiff is further entitled to the rescission of the 2020 Amendment, as this amendment was a breach of Section 10.1 of the Credit Agreement.

325.    In the alternative, to the extent it is determined that there is an adequate remedy at law or that rescission is impracticable, Plaintiff seeks compensatory or rescissory damages.

## THIRTEENTH CAUSE OF ACTION
### Declaratory Judgment –
### Event of Default; Section 10.1, 2016 Credit Agreement –
### Failure to Obtain Consent of Majority Facility Lenders for Purported Waiver
### (Against RCPC)

326.   Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

327.   Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

328.   An actual and justiciable controversy presently exists between Plaintiff and RCPC concerning whether the failure to obtain the consent of Majority Facility Lenders for the Purported Waiver constituted a breach of and Event of Default under the 2016 Credit Agreement.

329.   A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations herein.

330.   At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

331.   The Section 10.1 Proviso of the 2016 Credit Agreement dictates that, subject to certain restrictions, the Borrower and the Required Lenders under the 2016 Credit Agreement may amend, supplement, or modify such agreement, "provided, . . . that the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities."  2016 Credit Agreement § 10.1, at 158.

332.   On May 7, 2020, RCPC and Citibank purported to execute a series of transactions, including a the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, the issuance

of the Sham Revolver, the granting of the Pari Passu Lien, the 2020 Pari Passu Intercreditor Agreement, and the 2020 BrandCo Credit Agreement.

333.   The Purported Waiver is ineffective.   The Purported Waiver, by its terms, "adversely affect[ed] the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."   *First*, the 2016 Term Lenders, and only the 2016 Term Lenders, had a right to assert that the Borrower violated the 2016 Credit Agreement by, among other things, purportedly issuing the Sham Revolver in bad faith and notwithstanding an existing Event of Default.   The Sham Revolver was created as part of the vote-rigging effort, solely to enable the adoption of the Proposed Amendment.   The holders to the Revolving Commitments, by participating in and benefitting from this manipulative process, with full knowledge of the circumstances, have unclean hands, had no right to assert that the Borrower violated the 2016 Credit Agreement, and were unaffected by the Purported Waiver.

334.   *Second*, the Purported Waiver has little or no effect on the Sham Revolver's rights in respect of payments because the Sham Revolver is not at risk of not being repaid.   Its shelf-life of 10 to 15 business days reduces its risk to nothing, while the 2016 Term Lenders are left holding the bag for years.   If, for example, Revlon defaults on its debt repayments to 2016 Term Lenders when they come due, the Sham Revolver will have been repaid well before Revlon's resulting bankruptcy.    All negative effects of the Purported Waiver in respect of payments disproportionately impacted the 2016 Term Lenders, while holders of the Sham Revolver's Revolving Commitments were not affected at all.

335.   Because the Purported Waiver "adversely affects the rights" of the 2016 Term Lenders "in respect of payments hereunder in a manner different from such amendment that affects" the rights of the Sham Revolver Lenders, and because RCPC did not even attempt to

obtain, let alone obtain, consent of the majority of 2016 Term Lenders, the Purported Waiver is in breach of Section 10.1's requirement of consent by Majority Facility Lenders.  The Purported Waiver constituted the Second Section 10.1 Proviso Breach.

336.    Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's breach of Section 10.1 of the 2016 Credit Agreement in an amount to be proven at trial. Such damages include fees and costs incurred by Co-Op Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC. The damages suffered by Co-Op Lenders are such that there is no complete or adequate remedy at law.

337.    RCPC and Citibank's breach of Section 10.1 is a failure of Citibank and RCPC to observe or perform under the 2016 Credit Agreement and therefore is an "Event of Default" under Section 8.1 of the Credit Agreement.

338.    On August 12, 2020, the Required Lenders under the 2016 Credit Agreement sent Plaintiff UMB Bank, the new administrative agent under the 2016 Credit Agreement, a Notice of Event of Default stating that "the Purported Waiver affected only the rights of Term Lenders, did so adversely, and was in respect of the right to payment, [yet] the required consents of the Majority Term Loan Lenders were never sought nor obtained.  Accordingly the adoption of Purported Waiver in the First Amendment violated Section 10.1(a)."  The Notice of Event of Default stated that the purported adoption of the Purported Waiver, as part of the 2020 Amendment, was an Event of Default.

339.    Plaintiff is thus entitled to a declaration that RCPC breached Section 10.1 of the 2016 Credit Agreement by purporting to waive all existing Events of Default as part of the 2020 Amendment.

340.    Plaintiff is further entitled to a declaration that RCPC's breach of Section 10.1 of the 2016 Credit Agreement constituted an "Event of Default" under Section 8.1 of the 2016 Credit Agreement.

341.    Plaintiff is further entitled to a declaration that the Notice of Event of Default sent on August 12, 2020is a proper and effective Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement.

342.    Plaintiff is further entitled to a declaration that Lenders' direction, contained in the August 12, 2020 Notice of Event of Default, to declare the 2016 Term Loan "due and payable" as of the date of the Notice was proper and effective.

## FOURTEENTH CAUSE OF ACTION
### Declaratory Judgment –
### 2020 Amendment Is Void and Unenforceable
### (Against RCPC)

343.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

344.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

345.    An actual and justiciable controversy presently exists between Plaintiff and the RCPC concerning whether the 2020 Amendment is void and unenforceable.

346.    A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations herein.

347.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

348.   On May 7, 2020, RCPC purported to amend the 2016 Credit Agreement, resulting in the 2020 Amendment.   Section 10.1 of the 2016 Credit Agreement contemplates specific procedures and requirements pursuant to which the 2016 Agreement must be amended, requiring in all circumstances the "written consent of Required Lenders, the Administrative Agent and each Loan Party" and in certain circumstances, the "consent of the applicable Majority Facility Lenders."

349.   The 2020 Amendment neither received the written consent of the Required Lenders or the consent of the applicable Majority Facility Lenders.   Therefore the 2020 Amendment is invalid and unenforceable.

350.   Failure to obtain the contractually required consent further renders the 2020 Amendment invalid and unenforceable because the Co-Op Lenders did not receive any bargained for rights, interests, profits, or benefits under the 2020 Amendment, and RCPC did not undertake or suffer any bargained for forbearance, detriment, losses, or responsibilities.

351.   Under New York law, a contract is null, void, invalid, and unenforceable if not accepted by all parties and if not supported by consideration.

352.   Plaintiff is thus entitled to a declaration that the 2020 Amendment is null, void, invalid, and unenforceable.


### FIFTEENTH CAUSE OF ACTION
### Conversion
### (Against RCPC)

353.   Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

354.   At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.   The same parties

were also parties to a 2016 Guarantee and Collateral Agreement pursuant to which the 2016 Term Lenders had a first lien security interest on certain valuable intellectual property, including the BrandCo Collateral.

355.    In May 2020, RCPC intentionally entered into a series of transactions, including the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, and a 2020 Pari Passu Intercreditor Agreement which had the effect of excluding certain of Co-Op Lender's property interests to the BrandCo Collateral.  To the extent that these transactions are not void and unenforceable and are not rescinded by this court, these transactions purport to change Co-Op Lenders' property rights in the BrandCo Collateral.  Despite repeated requests by Co-Op Lenders to return property rights to the BrandCo Collateral, RCPC has not returned the BrandCo Collateral.

356.    Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's conversion of its valuable collateral.  The damages suffered by Co-Op Lenders are such that there is no complete or adequate remedy at law and therefore Plaintiff demands a return of all of property rights to the BrandCo Collateral of Co-Op Lenders, as they existed prior to series of transactions in late April and early May 2020.

357.    In the alternative, to the extent it is determined that there is an adequate remedy at law or that rescission is impracticable, Plaintiff seeks compensatory or rescissory damages.


## SIXTEENTH CAUSE OF ACTION
### Aiding and Abetting Conversion
### (Against Citibank, Jefferies, BrandCos, and AHG Lenders)

358.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

359.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.  The same parties

were also parties to a 2016 Guarantee and Collateral Agreement pursuant to which the 2016 Term Lenders had a first lien security interest on certain valuable intellectual property, including BrandCo Collateral.

360.    In May 2020, RCPC intentionally entered into a series of transactions, including the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, and a 2020 Pari Passu Intercreditor Agreement which had the effect of excluding certain of Co-Op Lenders' property interests to the BrandCo Collateral.  To the extent that these transactions are not void and unenforceable and are not rescinded by this court, these transactions purport to change Co-Op Lenders' property rights in the BrandCo Collateral.  Despite repeated requests by Co-Op Lenders to return property rights to the BrandCo Collateral, RCPC has not returned the BrandCo Collateral.

361.    Citibank, Jefferies, BrandCos, and AHG Lenders aided and abetted RCPC conversion of Co-Op Lenders' Collateral by participating in the 2020 BrandCo IP Sale-Leaseback Transaction and the 2020 Amendment.

362.    Each of Citibank, Jefferies, BrandCos, and AHG Lenders had actual knowledge of RCPC's conversion of the Co-Op Lenders' property interests.  They each knew that the Co-Op Lenders' had first-priority security interests in the BrandCo Collateral—with the sole exception of the American Crew IP, which already had been stripped away from the 2016 Term Lenders as a result of the 2019 Term Credit Agreement—and that the 2020 transaction was being carried out in such a way that the Co-Op Lenders would be stripped of that protection without any compensation.

363.    Each of Citibank, Jefferies, BrandCos, and AHG Lenders provided substantial assistance to RCPC in its conversion of the Co-Op Lenders' property interests.  Each of Citibank, Jefferies, and the BrandCos, for example, executed documents and participated in transactions that were essential aspects of the transaction, and that together brought about the deprivation of

collateral that was securing the 2016 Term Loans.  Similarly, the AHG Lenders, by assisting in the design of the transactions and providing the commitments necessary to ensure that the 2020 New Money Term Loan would close, were essential to the completion of RCPC's conversion of the Co-Op Lenders' property.

364.    The Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's conversion of its valuable collateral and Jefferies, BrandCo, and AHG Lender's aiding and abetting of RCPC in the conversion of this collateral.

**SEVENTEENTH CAUSE OF ACTION**
**Gross Negligence and Willful Misconduct**
**(Against Citibank)**

365.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

366.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

367.    Section 9.3 of the 2016 Credit Agreement states that Citibank, its officers, directors, employees, agents, and attorneys in fact may be liable for actions taken or omitted to be taken by them upon a finding that such actions or omissions "resulted from [their] own gross negligence or willful misconduct."

368.    On April 29, 2020, certain 2016 Term Lenders sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement.

369.    Section 9.5 of the 2016 Credit Agreement states that, "In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders."  After counsel for 2016 Term Lenders properly issued a Notice of Event of Default to Citibank on April 29, 2020,

Citibank did not notice any Lenders of the Notice of Event of Default, in breach of its contractual obligations under the 2016 Credit Agreement.  Section 9.5 of the 2016 Credit Agreement further states that Citibank "shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders . . . provided, that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders."

370.    Upon information and belief, had Citibank noticed all Lenders of this Event of Default, as it was contractually required to under the 2016 Credit Agreement, more of the Lenders would have been aware of the continuing Event of Default, causing them to vote against the Amendment to the Credit Agreement, and the Proposed Amendment would have failed, notwithstanding the issuance of the Sham Revolver.  Indeed, had one or more holders of a cumulative $10 million (0.5%) of the outstanding $1.8 billion 2016 Term Loan rescinded consent, the Proposed Amendment would have failed, upon information and belief.

371.    Counsel for the Co-Op Lenders, who constitute Required Lenders and Majority Facility Lenders under the 2016 Credit Agreement, also informed Citibank, as Agent, that "one of the conditions precedent to the effectiveness of any New Loan Commitment under Section 2.25 of the 2016 Credit Agreement is that no Event of Default shall exist [and] the new $100 million of Revolving Commitments . . . cannot be effectuated, and the Agent cannot execute and deliver any Joinder Agreement or other documentation to cause the establishment of such Revolving Commitments."

372.     On April 30, 2020, the lenders again alerted Citibank that, in light of the Event of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would constitute a further Event of Default.

373.     Notwithstanding the multiple warnings sent directly to Citibank, that very day, Citibank executed and delivered a Joinder Agreement and other documentation purporting to establish the Sham Revolver in the amount of $65 million, of which RCPC drew $63.5 million. Because an Event of Default existed at the time the Sham Revolver was to be issued, in violation of a condition precedent to its issuance, the establishment of the Sham Revolver, itself, constituted another Event of Default.

374.     Citibank tabulated the votes consenting to the Proposed Amendment.  The holders of less than 50% of the aggregate unpaid principal amount of the 2016 Term Loan Facility consented to the Proposed Amendment.  Therefore, the Proposed Amendment had the consent of neither the Majority Term Loan Facility Lenders nor the Required Lenders (the latter, because the improperly established Sham Revolver could not have been permissibly included).  Nonetheless, Citibank included the Sham Revolver in its calculations and claimed that the Required Lenders had consented to the Proposed Amendment.  Even if the Sham Revolver were eligible for inclusion in the calculation of Required Lenders, Citibank ignored the lack of consent from the Majority Facility Lenders—that is, the majority of 2016 Term Lenders—whose consent was required under the Section 10.1 Proviso to approve the 2020 Amendment that disproportionately and adversely affected the 2016 Term Lenders.

375.     The April 28, 2020 letter from counsel for the Co-Lenders (who constituted Required Lenders) to Citibank set forth detailed explanations of various deficiencies and breaches, and requested that "if [Citibank] disagree[s] with any of the foregoing, please promptly let us know

the basis for your disagreement . . . ."  On numerous other occasions, counsel for the Required Lenders warned Citibank that RCPC was expressly breaching the 2016 Credit Agreement or breaching RCPC's duty of good faith and fair dealing and that Citibank's (i) execution of documents to establish the Sham Revolver, (ii) facilitation of RCPC's vote manipulation by improperly including the Sham Revolver in the vote for the Proposed Amendment, and (iii) ratification of the 2020 Amendment, which, *inter alia*, purported to waive all existing Events of Default and release of certain of 2016 Term Lenders' liens would, themselves, constitute breaches of the 2016 Credit Agreement and breach Citibank's duty of good faith and fair dealing.

376.    Rather than engaging with these warnings, or providing any substantive response to the lenders from whom it was acting as Agent, Citibank *ignored* them wholesale, responding on April 29, 2020, that it "offers no opinion or comment with respect to your speculation regarding possible Events of Default or other misconduct by the Borrower in connection with the Proposed New Revolving Commitments or Proposed Amendment."  On May 8, 2020, Citibank reiterated that it "continues to offer no opinion or comment with respect to such matters. . . ."  Citibank established the Sham Revolver, facilitated RCPC's vote manipulation by improperly including the Sham Revolver in the vote for the Proposed Amendment, ratified the Proposed Amendment, which, *inter alia*, purported to waive all existing Events of Default, and released certain of Co-Op Lenders' liens.  Neither Citibank nor its counsel ever provided a substantive justification for its conduct.  Citibank did so without investigating any underlying allegations or, by its own admission, offering any opinion in support of its conduct.

377.    In sum, Citibank's actions and omissions include: (1) failing to notice Lenders of the Notice of Event of Default; (2) establishing the Sham Revolver; (3) including votes from the lenders to the Sham Revolver in tabulating the vote for the Proposed Amendment; (4) overseeing

the execution of the 2020 Amendment and Pari Passu Intercreditor Agreement, (5) ignoring directions from Required Lenders; and (6) enabling the transfer of the 2016 Term Lenders' valuable collateral and the stripping of their lien on that collateral.  These actions and omissions violated Citibank's obligations under, at minimum, Sections 2.25, 7.10, 9.5, and 10.1 of the 2016 Credit Agreement, and, individually and together, constituted gross negligence and willful misconduct on Citibank's part.  Citibank was well aware of its foregoing obligations under the 2016 Credit Agreement.  Such actions and omissions, individually and together, were also indisputably not in the "best interest of lenders," as required, constituting breaches of Section 9.5 of the 2016 Credit Agreement, willful misconduct, and gross negligence.

378.    Co-Op Lenders have suffered substantial damages as a direct and proximate result of Citibank's willful misconduct and grossly negligence in an amount to be proven at trial.  Such damages include fees and costs incurred by the Co-Op Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC.

## EIGHTEENTH CAUSE OF ACTION
### Breach of Contract –
### Agreement to Resign
#### (Against Citibank)

379.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

380.    At all relevant times following the execution of the 2016 Term Credit Agreement, RCPC, Citibank, and the Co-Op Lenders were parties to the 2016 Credit Agreement.

381.    On or about April 24, 2020, Mr. Morgan of BCM discussed BCM's concerns regarding the Proposed Amendment and RCPC's bad faith attempts to rig the vote for the Proposed Amendment with Mr. Zogheb, Citibank's Head of Global Debt Capital Markets.  Mr. Zogheb

offered to Mr. Morgan, who called on behalf of the Co-Op Lenders, that if a majority of 2016 Term Lenders presented a letter directing Citibank to resign, Citibank would resign as Agent prior to effectuation of the transaction.

382.   On April 25, 2020, in reliance on and in response to Mr. Zogheb's representation, the 2016 Term Lenders holding more than 50% of outstanding aggregate unpaid 2016 Term Loan principal "direct[ed] Citibank, N.A. to resign as Agent under the 2016 Credit Agreement." Subsequently, Michael Corbat, the CEO of Citibank, confirmed to BCM that Mr. Zogheb was overseeing the resignation.

383.   Based on the statements from Messrs. Zogheb and Corbat, 2016 Term Lenders holding more than 50% of the outstanding aggregate unpaid 2016 Term Loan principal (1) accepted Citibank's offer to resign if provided directions from the 2016 Term Lenders to do so, and (2) acted in reliance on that offer.

384.   Notwithstanding the representations from Messrs. Zogheb and Corbat that Citibank would resign upon direction to do so, Citibank reneged, breaching its agreement to resign as Agent.

385.   Thereafter, Citibank (1) failed to notice Lenders of an Event of Default; (2) established the Sham Revolver; (3) included votes from lenders to the Sham Revolver when tabulating the vote for the Proposed Amendment; (4) oversaw the execution of the 2020 Amendment and Pari Passu Intercreditor Agreement; (5) ignored directions from Required Lenders; (6) failed to act in the interests of Lenders; (7) stripped valuable collateral; and (8) played an essential role in the completion of transactions that was it was advised, and knew to be, contrary to the interests of Lenders.

386.   Co-Op Lenders have suffered substantial damages as a direct and proximate result of Citibank's breach of its agreement to resign as Agent.  Such damages include fees and costs

incurred by Co-Op Lenders in connection with enforcing their legal rights as well as a loss of unique and valuable collateral securing their loan to RCPC.

### NINETEENTH CAUSE OF ACTION
### Unjust Enrichment
**(Against RCPC, Citibank, Jefferies, BrandCo Entities, and AHG Lenders)**

387.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

388.    As a result of Defendants' inequitable conduct, Defendants have been unjustly enriched at the expense of the Co-Op Lenders.  When RCPC, Citibank, and the 2016 Term Lenders entered into the 2016 Credit Agreement, the 2016 Term Lenders bargained for a first-priority lien on the BrandCo Collateral.  In April and May of 2020, Citibank, RCPC, the BrandCo Entities, and AHG Lenders executed a series of transactions including the 2020 BrandCo IP Sale-Leaseback Transaction, establishment of the Sham Revolver, the 2020 Amendment, and execution of the 2020 Pari Passu Intercreditor Agreement.  As a result of this series of transactions, the first-priority lien on the BrandCo Collateral has been unjustly taken from Co-Op Lenders and been provided to BrandCo Entities and AHG Lenders.

389.    Equity and good conscience require that all of the amounts are paid to the Co-Op Lenders attributable to the following: (1) any interest in any property transferred away from Co-Op Lenders (or Citibank, acting as Agent for the 2016 Term Lenders) to the BrandCo Entities, the AHG Lenders, and Jefferies pursuant to the American Crew IP Sale-Leaseback Transaction, 2020 BrandCo IP Sale-Leaseback Transaction, Pari Passu Intercreditor Agreement, and the 2020 Amendment; (2) any interest payments, fees, or other consideration paid to Citibank in connection with the 2016 Credit Agreement, the 2020 Amendment, and the 2020 BrandCo Credit Agreement; (3) any interest payments, fees, or other consideration paid to Jefferies in connection with the 2020

BrandCo Credit Agreement; and (4) any interest payments, fees, or other consideration paid to AHG Lenders in connection with the 2020 Amendment and 2020 BrandCo Credit Agreement.

### TWENTIETH CAUSE OF ACTION
### Tortious Interference with Contract – 2016 Credit Agreement
### (Against Citibank, Jefferies, BrandCo Entities, and AHG Lenders)

390.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

391.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.  The same parties were also parties to a 2016 Guarantee and Collateral Agreement pursuant to which the 2016 Lenders had a first lien security interest on certain valuable intellectual property, including the BrandCo Collateral.

392.    Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . .  [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . . . to such Person . . . , except for . . . any such arrangement to the extent that the Fair Market Value of such Property does not exceed the greater of (i) $100,000,000 and (ii) 3.0% of Consolidated Total Assets at the time of such event . . . ."  2016 Credit Agreement  § 7.10.  Under the American Crew IP Sale-Leaseback Transaction, RCPC and its Restricted Subsidiary BrandCo Holdings transferred the American Crew IP to BrandCo, a "Person."  BrandCo, "such Person," leased the American Crew IP to RCPC.  Therefore, the American Crew IP Sale-Leaseback Transaction violated Section 7.10.

393.    Under the terms of Section 7.10, the American Crew IP constituted "personal Property" that was "transferred" and the license and royalty arrangement constituted a "lease." The Fair Market Value of the American Crew IP exceeded both $100,000,000 and 3.0% of Consolidated Total Assets at the time of such event in the aggregate.

394.    Section 10.1(a)(C) of the 2016 Credit Agreement states that no "waiver and no . . . amendment, supplement or modification [of the 2016 Credit Agreement] reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents (except as provided in Section 7.4(j)), release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders."

395.    On April 6, 2020, April 23, 2020, April 28, 2020, April 29, 2020, and April 30, 2020, Co-Op Lenders sent letters to Citibank, asserting the impropriety of the series of proposed transactions, including the issuance of the Sham Revolver, the Proposed Amendment, the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 BrandCo Credit Agreement, the granting of the Pari Passu Lien, and the 2020 Pari Passu Intercreditor Agreement.

396.    On April 28, 2020, Co-Op Lenders sent Citibank a letter regarding the series of proposed transactions, including the issuance of the Sham Revolver, the Proposed Amendment, the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 BrandCo Credit Agreement, the granting of the Pari Passu Lien, and the 2020 Pari Passu Intercreditor Agreement, stating that they would be in breach of multiple provisions of the 2016 Credit Agreement, the covenant of good faith and fair dealing, and would constitute actual and constructive fraudulent transfers.

397.    On April 29, 2020, certain Lenders sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement.  This Notice stated, amongst other things, that "[t]he undersigned Lenders hereby notify the Agent that the transfer of the American Crew IP by the Borrower to its Non-Guarantor Subsidiary, Beautyge II, LLC (the 'IP Transferee'), and the licensing back of the American Crew IP by the IP Transferee to the Borrower, in connection with the Ares Financing constitutes a breach of Section 7.10 of the 2016 Credit Agreement.  This breach of Section 7.10 of the 2016 Credit Agreement constitutes an Event of Default under Section 8.1(c) of the 2016 Credit Agreement."

398.    On April 30, 2020, the Co-Op Lenders again alerted Citibank that, in light of the Event of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would constitute a further Event of Default.

399.    On information or belief, each of these letters and notices to Citibank was shared with Jefferies, the BrandCo Entities, and AHG Lenders before the consummation of the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, the 2020 BrandCo Credit Agreement, and the 2020 Pari Passu Intercreditor Agreement.

400.    Despite these clear notices to Citibank (that were shared with Jefferies, the BrandCo Entities, and the AHG Lenders) stating that the proposed transactions, including the issuance of the Sham Revolver, the Proposed Amendment, the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 BrandCo Credit Agreement, the granting of the Pari Passu Lien, and the 2020 Pari Passu Intercreditor Agreement, would constitute breaches of Co-Op Lenders' rights under the 2016 Credit Agreement, Defendants consummated the transactions, thereby knowingly procuring RCPS's breaches of the 2016 Credit Agreement.  Defendants' intentional procurement of RCPC's breaches of the 2016 Credit Agreement was without justification.

401.    The Co-Op Lenders have suffered substantial damages as a direct and proximate result of Citibank, Jefferies, the BrandCo Entities, and the AHG Lenders' tortious interference in Co-Op Lenders' rights under the 2016 Credit Agreement in an amount to be proven at trial.

### TWENTY-FIRST CAUSE OF ACTION
### Actual Fraudulent Transfer
### (Against RCPC, Jefferies, Ares, the BrandCo Entities, Citibank, and the John Doe Lenders)

402.    Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

403.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.  The same parties were also parties to a 2016 Guarantee and Collateral Agreement pursuant to which Co-Op Lenders had a first lien security interest on certain valuable intellectual property, including the BrandCo Collateral.

404.    In May 2020, Citibank, RCPC, Jefferies, the BrandCo Entities, and the John Doe Lenders entered into a series of transactions, including the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, the granting of the Pari Passu Lien, the Pari Passu Intercreditor Agreement, and the 2020 BrandCo Credit Agreement.  As a result of this series of transactions, the BrandCo Collateral has been transferred to the BrandCo Entities, the lien on the BrandCo Collateral has been stripped from the Co-Op Lenders and transferred to Jefferies for the benefit of the John Doe Lenders, and the lien on the remaining collateral of the 2016 Term Lenders has been massively diluted by the granting of the Pari Passu Lien for the benefit of the John Doe Lenders.

405.    Section 273(a) of the New York Voidable Transfer Act ("NYVT Act") states that a "transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the

creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor."

406.     Under the 2016 Credit Agreement, Plaintiff and the Co-Op Lenders are Creditors of RCPC and RCPC is a Debtor, as those terms are defined under the NYVT Act.

407.     By entering into the series of transactions, RCPC had actually intended to hinder, delay, or defraud Co-Op Lenders by transferring the BrandCo Collateral to the BrandCo Entities, transferring the security interest in the BrandCo Collateral to Jefferies as agent under the 2020 BrandCo Credit Agreement, and massively diluting the lien on their remaining collateral by the granting of the Pari Passu Lien, for the benefit of the John Doe Lenders (as a direct or subsequent transfer), and incurring the obligations under the 2020 BrandCo Credit Agreement.  RCPC's intent to hinder, delay, or defraud Co-Op Lenders is demonstrated by, among other things, the fact that:

a.     RCPC retained possession or control of the BrandCo Collateral after the transfer of the BrandCo Collateral;

b.     Before the transfer of BrandCo Collateral was made, RCPC had been threatened with suit;

c.     RCPC was insolvent at the time of or became insolvent shortly after the transfer of the BrandCo Collateral was made;

d.     The transfer of the BrandCo Collateral and granting of the Pari Passu Lien were made shortly before RCPC incurred substantial debt;

e.     RCPC was able to transfer the BrandCo Collateral and grant the Pari Passu Lien only as a result of the improper issuance of the Sham Revolver;

f.     The BrandCo Collateral constituted all or substantially all of the assets of RCPC;

408.     Plaintiff and the Co-Op Lenders have suffered substantial damages as a direct and proximate result of RCPC's transfer of the BrandCo Collateral and the granting of the Pari Passu Lien.  Under the NYVT Act, Plaintiff is entitled to a judgement that: (1) transfer of the BrandCo Collateral to the BrandCo Entities should be voided, (2) transfer of all liens in the BrandCo Collateral and the Pari Passu Lien should be voided, (3) all obligations arising under any of the facilities provided in the 2020 BrandCo Credit Agreement should be voided, (4) all disbursements made by RCPC under any of the facilities provided in the 2020 BrandCo Credit Agreement should be voided, and (5) the Voidable Ares Premium Transfer and Voidable Fee Transfers should be voided.

## TWENTY-SECOND CAUSE OF ACTION
### Constructive Fraudulent Transfer
(Against RCPC, Jefferies, Ares, the BrandCo Entities, Citibank, and the John Doe Lenders)

409.     Plaintiff repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

410.     At all relevant times following the execution of the 2016 Credit Agreement, RCPC, Citibank, and the 2016 Term Lenders were parties to the 2016 Credit Agreement.  The same parties were also parties to a 2016 Guarantee and Collateral Agreement pursuant to which Co-Op Lenders had a first lien security interest on certain valuable intellectual property, including the BrandCo Collateral.

411.     In May 2020, Citibank, RCPC, Jefferies, the BrandCo Entities, and John Doe Lenders entered into a series of transactions, including 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, the granting of the Pari Passu Lien, the 2020 Pari Passu Intercreditor Agreement, and the 2020 BrandCo Credit Agreement.  As a result of this series of

transactions, the BrandCo Collateral has been transferred to the BrandCo Entities, the lien on the BrandCo Collateral has been stripped from the Co-Op Lenders and transferred to Jefferies for the benefit of the John Doe Lenders, and the lien on the remaining collateral of the 2016 Term Lenders has been massively diluted by the granting of the Pari Passu Lien for the benefit of the John Doe Lenders.

412.    Under Section 273(a) of the NYVT Act, a "transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation … without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (I) was engaged or was about to engage in a business or a transaction for which the remaining asserts of the debtor were unreasonably small in relation to the business or transaction; or (II) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

413.    Under Section 274 of the NYVT Act, "a transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

414.    Under the 2016 Credit Agreement, Plaintiff and the Co-Op Lenders are Creditors of RCPC and RCPC is a Debtor, as those terms are defined under the NYVT Act.

415.    RCPC transferred the BrandCo Collateral to the BrandCo Entities, transferred the security interest in the BrandCo Collateral to Jefferies as agent under the 2020 BrandCo Credit Agreement, and granted the Pari Passu Lien, for the benefit of the John Doe Lenders (as a direct

or subsequent transfer), and incurred the obligations under the 2020 BrandCo Credit Agreement, in each case, at time when RCPC (I) was engaged or was about to engage in a transaction for which the remaining assets of RCPC were unreasonably small in relation to the transaction; (II) intended to incur, or believed or reasonably should have believed that RCPC would incur, debts beyond RCPC's ability to pay as they became due; and (III) was insolvent.

416.    RCPC did not receive reasonably equivalent value for its transfer of the BrandCo Collateral, the security interest therein to Jefferies, the granting of the Pari Passu Lien, or the obligations incurred under the 2020 BrandCo Credit Agreement.   No value was received in exchange for the transfer to the BrandCo Entities of the BrandCo Collateral, worth hundreds of millions of dollars, without receiving any value in return, because the BrandCo Entities were themselves rendered insolvent as a result of the guaranteed obligations incurred under 2020 BrandCo Credit Agreement.

417.    Plaintiff and the Co-Op Lenders have suffered substantial damages as a direct and proximate result of the transfer of the BrandCo Collateral, transfer of the security interest therein to Jefferies, the granting of the Pari Passu Lien, and the obligations incurred under the 2020 BrandCo Credit Agreement.   Under the NYVT Act, Plaintiff is entitled to a judgement that: (1) transfer of the BrandCo Collateral to the BrandCo Entities should be voided, (2) transfer of all liens in the BrandCo Collateral and the Pari Passu Lien should be voided, (3) all obligations arising under any of the facilities provided in the 2020 BrandCo Credit Agreement should be voided, (4) all disbursements made by RCPC under any of the facilities provided in the 2020 BrandCo Credit Agreement should be voided, and (5) the Voidable Ares Premium Transfer and Voidable Fee Transfers should be voided.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants:

A.  Ordering specific performance of the 2016 Credit Agreement and 2016 Guarantee and Collateral Agreement;

B.  Rescinding the 2020 Amendment or declaring that the 2020 Amendment is void and not enforceable;

C.  Rescinding the 2020 Pari Passu Intercreditor Agreement or declaring that the 2020 Pari Passu Intercreditor Agreement is void and not enforceable;

D.  Awarding damages in an amount to be proven at trial to compensate the Co-Op Lenders for the loss of the liens on collateral securing payment of their loans under the 2016 Credit Agreement;

E.  Declaring the Defendants have materially breached the 2016 Credit Agreement in several respects;

F.  Declaring that Defendants conduct and breaches of the 2016 Credit Agreement constitute multiple Events of Default under the 2016 Credit Agreement;

G.  Declaring that the Co-Op Lenders have properly noticed these Events of Default of the 2016 Credit Agreement and they are effective;

H.  Declaring that the Co-Op Lenders' direction to Plaintiff UMB Bank to declare the 2016 Term Loan "due and payable" as of the date of the notice was effective;

I.  Voiding (1) the transfer of the BrandCo Collateral to the BrandCo Entities, (2) the transfer of all liens in the BrandCo Collateral, (3) the Pari Passu Lien, (4) all obligations arising under any of the facilities provided in the 2020 BrandCo Credit Agreement, (5) all disbursements made by RCPC under any of the facilities provided in the 2020 BrandCo Credit Agreement, and (6) all disbursements made by RCPC with the proceeds of the transactions consummated in May 2020.

J.  Awarding reasonable costs and expenses incurred in this action, including attorneys' fees;

K.  Awarding pre-judgment interest on all such damages, monetary or otherwise; and

L.  Awarding such other, further, and different relief as the Court may deem just and proper.

Dated: New York, New York         QUINN EMANUEL URQUHART &
       August 12, 2020                SULLIVAN, LLP

By:  /s/ Robert Loigman
      Michael Carlinsky
      Robert Loigman
      Benjamin Finestone
      Adam M. Abensohn
      Anil Makhijani
      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      (212) 849-7000
      michaelcarlinsky@quinnemanuel.com
      robertloigman@quinnemanuel.com
      benjaminfinestone@quinnemanuel.com
      adamabensohn@quinnemanuel.com
      anilmakhijani@quinnemanuel.com

      Bennett Murphy
      865 S. Figueroa Street, 10th Floor
      Los Angeles, CA 90017
      (213) 443-3000
      bennettmurphy@quinnemanuel.com

      *Attorneys for UMB Bank, National Association*